THE NORTHERN TRUST COMPANY, Executor of the Estate of Harriet F. B. Stuart, Deceased, Coexecutor and Cotrustee under the Last Will and Testament of Harold L. Stuart, Deceased, Plaintiff-Appellee, v. CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO, Coexecutor and Cotrustee under the Last Will and Testament of Harold L. Stuart, Deceased, Defendant-Appellee.—(ELIZABETH B. STUART, Coexecutor and Cotrustee under the Last Will and Testament of Harold L. Stuart, Deceased, Plaintiff-Appellant-Appellee; ILLINOIS INSTITUTE OF TECHNOLOGY, Plaintiff-Appellant; MUSEUM OF SCIENCE AND INDUSTRY, Intervenor-Appellant; ART INSTITUTE OF CHICAGO, Intervenor-Appellant; DePAUL UNIVERSITY et al., Intervenors-Appellants-Appellees; CHICAGO HISTORICAL SOCIETY et al., Intervenors.)

First District (4th Division)   No. 62037

Opinion filed October 13, 1976.

Samuel W. Witwer, J. Alfred Moran, Samuel W. Witwer, Jr., and Timothy R. Young, all of Witwer, Moran, Burlage & Atkinson, of Chicago, for appellant Illinois Institute of Technology.

Owen Rall, of Peterson, Ross, Rall, Barber & Seidel, of Chicago, for appellant Museum of Science and Industry.

William A. McSwain and James O. Silliman, both of Eckhart, McSwain, Hassell & Silliman, of Chicago, for appellant Art Institute of Chicago.

Thomas J. Russell, of Mitchell, Russell & Kelly, of Chicago, for appellant-appellee DePaul University.

William H. Oswald, of Office of General Counsel, of Loyola University School of Law, of Chicago, for appellant-appellee Loyola University.

Michael C. Weston, of Office of University Attorney, of Northwestern University, of Evanston, for appellant-appellee Northwestern University.

Charles E. Herzog, of Bell, Boyd, Lloyd, Haddad & Burns, of Chicago, for appellant-appellee University of Chicago.

Vernon T. Squires, of Wilson & McIlvaine, of Chicago, for appellants-appellees Field Museum of Natural History, Orchestral Association, Children's Memorial Hospital, Chicago Boys Clubs, and Lake Forest College.

Stephen L. Schar, of Aaron, Aaron, Schimberg & Hess, of Chicago, for appellant-appellee American Red Cross.

Rodney Joslin, of Jenner & Block, of Chicago, for appellant-appellee Girl Scouts of Chicago.

Christopher W. Wilson, of Hopkins, Sutter, Mulroy, Davis & Cromartie, of Chicago, for appellant-appellee Blackburn College.

John Angle, of Kirkland and Ellis, of Chicago, for appellants-appellees Boy Scouts of America and Rehabilitation Institute.

Otis H. Halleen, of Sonnenschein, Carlin, Nath & Rosenthal, of Chicago, for appellant-appellee Michael Reese Hospital and Medical Center.

John M. Rammel, of Williams, Rutstein, Goldfarb & Sharp, Ltd., of Chicago, for appellant-appellee Mercy Hospital and Medical Center.

James J. McClure, Jr., of Gardner, Carton, Douglas, Chilgren & Waud, of Chicago, for appellants-appellees Rush-Presbyterian-St. Luke's Hospital, Berea College, and Chicago Educational Television Association.

Lee A. Freeman, Sr., of Freeman, Freeman & Salzman, of Chicago, for appellant-appellee Lyric Opera of Chicago.

William L. Ryan, of Davis, Dietch & Ryan, of Chicago, for appellant-appellee Salvation Army—Chicago Chapter.

Louis M. Rundio, Jr., of McDermott, Will & Emery, of Chicago, for appellant-appellee YMCA of Metropolitan Chicago.

Frank J. Madden, of Boodell, Sears, Sugrue, Giambalvo & Crowley, of Chicago, for appellant-appellee Union College.

William T. Hart, Allan Horwich, and Joan E. Steinman, all of Schiff, Hardin & Waite, of Chicago, for appellant-appellee Elizabeth B. Stuart and appellee Northern Trust Company.

Roger W. Barrett, Franklin P. Auwarter, and Muriel B. Irwin, all of Mayer, Brown & Platt, of Chicago, for appellee Continental Illinois National Bank and Trust Company of Chicago.

Willard L. King, of King, Robin, Gale & Pillinger, of Chicago, for intervenor Chicago Historical Society.

Mr. PRESIDING JUSTICE JOHNSON delivered the opinion of the court:

This is an appeal from a judgment order entered in an action brought by plaintiffs against a corporate co-trustee to settle a dispute which arose concerning a trust power to nominate and fund charitable organizations. The judgment, *inter alia*, approved and adopted a plan of distribution proposed by the corporate trustee which provided for a complete distribution of a charitable trust created pursuant to the will of Harold L. Stuart; approved a $250,000 grant to the Chicago Foundation for Cultural Development; and approved the individual co-trustees' designation of the remaindermen of certain life trusts created by the will. A consideration of this judgment necessitates a full statement of the facts.

Harold L. Stuart, the testator, died on June 30, 1966, leaving a multimillion-dollar estate. He was unmarried and survived by two sisters, Harriet F. B. Stuart and Elizabeth B. Stuart. A will executed by the testator on April 23, 1964, named Continental Illinois National Bank and Trust Company of Chicago (hereinafter Continental or the Bank) and his two sisters as co-executors and co-trustees. Under its terms, life estates were granted to each of the sisters in separate trusts of $1 million each, with the remainders to go to charity according to certain terms. The remainder of the Stuart estate was left in trust to be distributed to qualified charitable organizations. These charities were to be selected by the co-executors and co-trustees within 5 years of the testator's death and their interests were to vest at the end of that period. Accordingly, the trust should have been distributed or designated for distribution by June 29, 1971.

The facts adduced at trial showed that Harold L. Stuart was born in Rhode Island and came to Chicago in 1893 at the age of 14. Although largely self-educated, he obtained some formal education at Lewis Academy (now part of Illinois Institute of Technology), where he studied for five semesters between 1896 and 1900. The Stuart family originally maintained a home in Kenilworth, Illinois; however, since 1921, Stuart had shared a Chicago residence with his sisters, Harriet and Elizabeth, who were also unmarried. The relationship between the three was described as close and harmonious.

The testator, an investment banker of national renown, was the president and sole stockholder of Halsey, Stuart & Co., Inc., an investment banking firm and underwriter of fixed income public utility securities. He was devoted to building the firm to a position of preeminence in the investment banking business and, with relation to this, was interested in building the city of Chicago into a financial center which could compete with New York.

In February 1964, David M. Kennedy, then chairman of Continental, invited Stuart to lunch to discuss the question of a will since he did not have one on file at the Bank. Kennedy asked whether he had a will and told him that it would be very bad for Continental if one of its largest individual shareholders did not have one with the Bank. He then explained the importance of having a will and the problems with intestacy. Various educational, civic and cultural organizations, and other institutions were mentioned as possible charitable recipients. Kennedy discussed his own activities with the Mayor's Committee for Economic and Cultural Development of Chicago and its difficulties in obtaining funds for its programs. Since Stuart was an enthusiastic supporter of Chicago and his business was centered there, Kennedy suggested that he would probably want most of his estate to be distributed in this area. The discussion also explored in detail the subject of providing for the needs of Stuart's sisters. Kennedy then stated that the Bank would recommend a lawyer who would draft the document for him. Stuart in fact had a will which was executed in 1942 but, according to the testimony, it was never mentioned in this conversation. Kennedy testified that he later spoke with the attorney who was drafting the will and asked that co-executors and co-trustees be included and that the necessity for this be explained to the testator.

The vice chairman of the board of Continental, Donald Graham, testified that he had a luncheon meeting with Stuart and another officer of the Bank, Arthur Leonard, prior to the execution of the will. The purpose of this conference was to discuss the proposed will, and to give Stuart another high-level contact at the Bank in addition to Kennedy. Two or three months later, in another luncheon conference, Graham told Stuart that he should consider making gifts during his lifetime so that he would have the satisfaction of knowing to which charities his money was going. Stuart responded that he did not have any particular beneficiaries in mind. A suggestion that he might want to consider making anonymous gifts was answered in the negative.

Edward D. Benninghoven, former head of the business development section of the trust department at Continental, testified that he met with the testator, the Stuart sisters, Arthur Leonard, Kennedy and another vice president on April 23, 1964, the date of the execution of the will. During the course of the meeting, Stuart stated that he had no interest in designating the various tax-exempt organizations to which the money would go. Because he had been pestered for money by so many organizations, he preferred that his executors and trustees consummate that part of the problem after his death, rather than making his own decision with respect to disposition of the funds. Benninghoven testified that nothing was said by the sisters.

The testimony of Elizabeth Stuart was in conflict with that offered by the Bank. She stated that the testator never discussed his will with anyone except his two sisters, his brother Charles (who died in 1963) and Arthur Leonard, who was a good friend. Copies of the will were given to the sisters as soon as it was drafted and they read it many times before its execution. The sisters discussed the "majority clause" in the will with Stuart who explained that they, Harriet and Elizabeth, were the majority because they knew exactly what he wanted. The witness stated that at the time the will was signed, the testator told Leonard that Harriet and she were trained, experienced, and preeminently qualified to be his co-executors and co-trustees. Leonard promised to cooperate in any way with the sisters for the testator's wishes and desires.

Elizabeth's testimony disclosed that, several years before his death, the testator had orally apprised Harriet, Charles, and her of a list of gifts to be made. Then, in repeated conversations with his sisters after execution of the will, Stuart spoke of his interest in leaving money to five specific charitable organizations. First, he wanted to establish a school at the Illinois Institute of Technology and designated three-quarters of his estate to endow the school for a century. Second, a grant was to be made to the Kenilworth Historical Society in memory of the Stuart family. The third nominee was the Society of Cincinnati in Washington, D.C. for the construction of a gallery in his honor. The Art Institute was to receive a gift to build an auditorium for the people of Chicago, regardless of race, color, or creed. Then if any funds were left over, the final recipient was (apparently) either the Chicago Historical Society or the Newberry Library. Elizabeth testified that the testator did not ask where they wanted the money to go and that they did not try to influence him. He never told anyone outside the family about the list because he felt such commitments might hurt his business; should his enterprise fail, no one would have any confidence in him as a result of such promises. Elizabeth also stated that Stuart never had a luncheon alone with Kennedy. Harriet Stuart, who died after this appeal was filed, did not testify at trial.

On August 29, 1966, Continental and the Stuart sisters qualified as trustees. The testimony offered by the Bank showed that a day or so after Stuart's death, M. James Termondt, a Continental vice president, assumed responsibility for administration of the estate. Termondt testified that because of the publicity about the estate and the dispositive provisions of the will, the Bank was inundated with requests from various organizations seeking consideration as possible recipients. When phone calls came in, Termondt instructed the callers to write a general letter indicating that they wished to be considered. Each letter was acknowledged and placed in a file. In order to determine where the testator's charitable interests lie, the Bank reviewed his tax returns and

those of Halsey, Stuart & Co., talked with his associates, and studied his papers and records.

Termondt stated that he had the first of some 15 or 20 telephone conversations with Harriet Stuart about 6 or 7 months after Stuart's death. In their discussions, Harriet inquired about such facts as how much money would be available for distribution; why distribution could not be made immediately; why administration could not be expedited and all the problems solved. Both she and Elizabeth were quite concerned about knowing the exact amount of money available. Termondt explained that the Bank did not know what the amount would be because of tax problems and would not know until the litigation was resolved. When Harriet was questioned about the types of requests she and her sister had received and their plans for distribution, she replied that they had things in mind, but would not divulge the details.

Kennedy testified at trial that he had several telephone conversations with Harriet in 1967. In one conversation, he mentioned that the Bank had received a request for contribution from the now defunct *Chicago Magazine*. This magazine was published by the New Chicago Foundation which had been organized by the Mayor's Committee for Economic and Cultural Development of Chicago whose purpose was to extend the economic and cultural advantages of the city. Kennedy told Harriet that the request, $250,000, was reasonable in view of the total amount of the estate and would meet the criterion that he expected with the testator's interest in Chicago. Harriet gave no reaction to this. The *Chicago Magazine* was mentioned again in another conversation about 2 months later when Kennedy informed Harriet that the Bank was proposing a grant of $250,000 to it.

On January 16, 1968, Kennedy wrote a memorandum to Clare Furlong, a senior vice president, instructing him to have $250,000 transferred from the Stuart trust to the account of the New Chicago Foundation and to prepare a written authorization for the sisters to sign. The evidence revealed, however, that no document purporting to give written authorization for the gift was ever sent to the sisters, although it was prepared pursuant to his direction. When it was discovered that the New Chicago Foundation, recognized as a civic organization under section 501(c)(4) of the Internal Revenue Code, was not a qualified charitable organization under section 501(c)(3) as required by the will, a bank officer suggested that payment be made to the Chicago Foundation for Cultural Development. This foundation was a legal entity created to receive and disburse charitable gifts to further the purposes of the Committee and had received a ruling from the Internal Revenue Service that it qualified as a section 501(c)(3) organization. On January 26, 1968, a

grant of $250,000 was made to the Chicago Foundation for Cultural Development and thereafter was transferred in two separate payments to the New Chicago Foundation.

In February 1967, about 7 months after the testator's death, Harriet Stuart contacted the Illinois Institute of Technology (hereinafter IIT) and spoke with the director of the evening division. Subsequently, Mark W. Bates, then IIT's director of development, was informed that she was interested in obtaining information about the Lewis Institute, one of IIT's predecessor schools, and about IIT's current educational programs. Bates wrote her a letter which detailed this information. In July 1967, Harriet again contacted IIT, seeking additional information. In response, Robert Nelson, vice president of development, wrote that IIT's records showed that the testator had attended Lewis Institute for five semesters between 1896 and 1900. The letter revealed that the sisters "expressed a desire to assist the university while carrying out the philanthropic desires" of the testator.

On September 11, 1967, Nelson met with William Funck, vice president in charge of estate administration at the Bank. In a memorandum to IIT's president dated September 12, 1967, Nelson wrote that he had received two telephone calls from Harriet Stuart who had disclosed a desire to do something for IIT and indicated that "big money" was involved. The memorandum also stated that Funck had been unaware of the phone calls but had said that this might explain what Harriet had in mind when she told him that the sisters had some definite ideas of where they wanted part of the money to go.

Toward the end of May in 1968, Harriet called Mark Bates to inform him that she and her sister were interested in making a substantial grant to IIT from the estate. She requested that he prepare for her review a proposal relative to establishing a school of management at the institute. A few days later, Bates wrote in a memo that Harriet "decided IIT should get the first, and the largest, gift from her brother's estate. She spoke of several million." The memorandum also mentioned that Harriet wanted their discussion to be strictly confidential, and that she had not made her decision known to anyone, not even Continental.

IIT then prepared and submitted to Harriet a proposal requesting $7.5 million to fund a new school of management and finance. The amount of the proposed grant was determined by IIT. Harriet suggested two revisions in the proposal: the word "finance" should be added to the name of the school and the building should be named Stuart Hall. In accordance with these suggestions, a revised proposal for $8.5 million was submitted in August 1968 to Harriet who then contacted Bates and asked him to deliver it to the Bank. Bates left the proposal with Termondt's secretary on August 2. Then, in early September 1968, Bates received

another call from Harriet who, according to his memorandum of the call, felt emphatically that the Bank was working against IIT and indicated that she would see to it that IIT was taken care of—even if there was nothing left for anyone else.

Shortly thereafter, Bates met with William Funck and inquired about the status of IIT's proposal. Funck explained that the estate was involved in tax litigation, the resolution of which could not be determined. The total assets of the estate were estimated to be about $20 million, while the tax litigation was thought to involve about $5 or $6 million. On September 5, 1968, Funck wrote to the sisters informing them of the existence of proposals received by the Bank and expressing interest in their other thoughts with regard to distribution.

According to the testimony of Clare Furlong, the senior vice president in charge of the trust department, in the latter part of 1968 he received a call from IIT's general counsel who suggested a meeting between the sisters and the Bank. Furlong invited the sisters to a meeting in his office where he told them that Continental was considering the $8.5 million proposal, but that the total program also had to be considered. If some grants were too large, he explained, others would be excluded. The Bank also wished to determine whether the proposed donees could furnish money as well. Both of the sisters expressed interest in having the institutions themselves contribute funds. The parties discussed the testator's prominence in Chicago, his contribution to making Chicago a financial center, and their mutual desire to have fitting memorials that would reflect his prominence in the community. Furlong testified that he stressed the importance of having a program and the Bank's interest in cooperating with the sisters. He stated that at this time the sisters only had IIT in mind.

In late September, Harriet called Bates to ask if there was any kind of document which could be submitted to the Bank to reinforce the sisters' feelings about the IIT grant. Bates replied in the affirmative and she requested that one be drafted. Bates testified that he and the general counsel for IIT prepared and delivered to the Bank a "Statement of Intent." In this document, dated October 10, 1968, the Stuarts expressed their desire that IIT receive $8.5 million to establish the Harold Leonard Stuart School of Management and Finance in accordance with their proposal. The statement also recited:

> "Accordingly, we hereby request, and to the extent we have the right to do so, hereby direct that such a grant, by the estate of Harold Leonard Stuart, to Illinois Institute of Technology, be made as soon as possible, and prior to any other commitments for charitable, educational or religious purposes."

Funck acknowledged receipt of the letter and promised to give it full

consideration as soon as he had an opportunity to meet with Kennedy, the Bank's president, who was out of the country at the time. On October 18, 1968, the Bank received another statement signed by the sisters which stated in full:

> "We, the undersigned, Harriet F. B. Stuart, and Elizabeth B. Stuart, do hereby state that, on numerous occasions, during the last six months of his life, our late brother, Harold Leonard Stuart, alumnus of Illinois Institute of Technology, did express, to us, his wish and desire that a major share of his estate be made available, to Illinois Institute of Technology, for the establishment of a School of Management and Finance."

On February 19, 1969, Termondt wrote a letter to the sisters which estimated the value of the estate assets to be $20,402,490. Because a deficiency had been assessed by the Internal Revenue Service, thereby increasing the Illinois inheritance tax, the Bank had decided to hold a reserve until a final determination was made. Accordingly, Continental concluded that only approximately $11 million should be considered for distribution at that time. The letter also set forth certain provisions of the will concerning qualified charitable organizations and the so-called "majority clause." Termondt testified that this reference to the will was necessary because he had been unable to discern the intentions of the individual trustees. In prior conversations, he was told only that they would let the Bank know their ideas at the proper time.

Within a few days, Termondt received a call in response to this letter. Harriet informed him that the sisters were going to make the decision independently of the Bank, that they really did not care what the will said, and that the Bank was merely a custodian. Because the sisters had been informed that they constituted the majority of the trustees and therefore could make the decision by themselves, they felt that the Bank had no responsibility in the matter whatsoever. Termondt testified further that for the first time Harriet revealed other intended beneficiaries: the Society of Cincinnati, the Kenilworth Historical Society, and the Genealogical Society in Washington, D.C. The sisters wanted to memorialize their brother in Chicago, where he had earned his money, in the nation's capital, and in Kenilworth where they had lived as children.

On February 27, 1969, the Bank's trust executive committee, a group of senior officers within the trust department who passes on discretionary proposals regarding the selection of charitable recipients, met to discuss the $8.5 million IIT request. Termondt advised the committee that approximately $15 million would be left for distribution, assuming that the tax case was lost, and pointed out that an $8.5 million grant would constitute more than 50 percent of the fund and would be dispropor-tionate to the total amount available when the total plan of the sisters had

not been disclosed. He indicated that the Bank should attempt to schedule a meeting with the co-trustees to negotiate an equitable arrangement for the distribution of the funds. The following day, pursuant to a request of the committee, Termondt prepared a memorandum listing the organizations that had contacted the Bank, and identifying the schools that had contact with Stuart during his lifetime.

About March 11, 1969, Termondt and Furlong conferred with certain officials at IIT. They stated that the Bank felt the figures were too high in relation to the overall amount in the estate and expressed interest in seeing whether a school of management could be instituted on a reduced grant. One official indicated that from a financial viewpoint, there were certain items in the proposal that need not be there. Various alternatives such as setting up fellowships, chairs, and scholarships were discussed. Furlong asserted that the Bank did not want to spend over $5 to $5.5 million. The official then said that IIT had $1 million in funds from other sources which could be put into the venture. Subsequently, the parties worked out a proposal for $5 million which was accepted on April 3, 1969.

According to Termondt's testimony, Harriet said, in a later conversation, that she and her sister were pleased and appreciative of the Bank's efforts in finalizing the IIT grant. He then reiterated the Bank's desire to know their areas of interest in order to negotiate a plan of distribution. Harriet advised him that the next grant in their plan was for the Society of Cincinnati and that they were not interested in discussing any thing else until that was completed. She further stated that they were not interested in meeting with the Bank—they were going to make the decision.

In late summer of 1969, Continental concluded that formal trusts would have to be instituted. The testimony revealed that this was not performed initially because the Bank personnel thought it would be possible to fund the charitable requests out of the estate since the same parties were both executors and trustees. However, the tax litigation had made this impossible. The account was therefore transferred to Frank Wright and E. W. Bergstrom in the personal trust division. Wright testified that on September 5, 1969, he sent a letter inviting the sisters to a luncheon or conference at the Bank. In the alternative, Wright suggested that he and Bergstrom visit the sisters at their home. When he called 2 weeks later to ask if they had considered the invitation, Harriet replied that they did not feel it was necessary to come to the Bank; that whatever business was necessary could be transacted either by phone or letter; and that they had their plans and were moving forward with them. Wright testified that he pressed the invitation, noting that less than 2 years remained to complete the program as required by the will. The sisters also refused to have Wright and Bergstrom visit at their home.

Frequent conversations were held between the parties from September 1969 until the end of March in order to carry out the commitments the sisters wanted made to the Society of Cincinnati and the Kenilworth Historical Society. Wright testified that during the course of one such conversation, he again inquired about the sisters' total program so that they could plan a scheme of distribution together. Harriet stated that when the Cincinnati grant was completed, they would talk about the rest. In a subsequent conversation, she told Furlong about a proposed grant of $1 million to the Kenilworth Historical Society.

On December 19, 1969, Furlong wrote a letter to the sisters summarizing the status of negotiations with the Society of Cincinnati and recommending a grant of $500,000 with an additional agreement to match dollar per dollar the amount raised for this purpose, up to $250,000. The letter also mentioned that the time remaining to select the other charitable recipients was about 1½ years and emphasized the importance of making steady progress in the selections. Various organizations which the Bank considered as affording appropriate memorial opportunities were listed for the sisters' consideration. The letter requested a meeting to discuss possible gifts.

Wright testified that, at his request, a list of those charitable organizations that had either submitted a letter or proposal in connection with Stuart's estate was prepared. He also obtained a record of charitable gifts made by Halsey, Stuart & Co. through the years. The testator's annual business diaries were read to gain insight into his charitable interests from the meetings he had with representatives of diverse organizations and institutions. Wright also interviewed Stuart's personal secretary to find out about his relationships with various colleges and charities and his day-to-day contacts. In addition, he conversed with an associate of Halsey, Stuart & Co. to obtain similar information. In January, Wright was asked to draft a letter proposing a total program which could be suggested to the sisters as an approach to the overall problem of the disposition of the entire estate.

On February 9, 1970, a letter was sent to the sisters informing them of the progress being made toward completion of the grant to the Society of Cincinnati and of the discussions held with representatives of the Kenilworth Historical Society. The letter stated that Continental's files contained approximately 200 proposals from a variety of organizations to many of which the testator had made contributions and that the file was available for their review. Eighteen educational, cultural, youth and health institutions or organizations were listed along with proposed amounts to be granted to each, ranging from $10,000 to $1.25 million. The use and appropriateness of the larger grants were discussed. Furlong testified that this communication was an attempt to delineate the Bank's

problem and to try to make progress on formulating a total program which would recognize prominent memorials for the testator and to select organizations which would continue on the memorials since they were not being endowed. The judgment of the corporate trustee was said to be affected by the investigation made of Stuart's past contributions and his diary. The sisters made no specific response to this letter.

On February 20, 1970, Furlong again wrote to the individual trustees to report on further progress with the commitments. Reference was made to certain provisions of the will and to the time obligations. Wright subsequently forwarded additional proposals and suggestions for the sisters' consideration. The evidence did not indicate that the individual trustees responded to this correspondence. However, on March 13, 1970, they approved a gift of $550,000 to the Society of Cincinnati and, on May 7, 1970, a grant of $550,000 to the Kenilworth Historical Society.

On May 21, 1970, Bergstrom wrote a letter to the sisters in which he referred to a question raised by Harriet concerning the necessity for the Bank's approval of gifts. He stated that the Bank's approval was necessary and required, quoting the majority clause in the will which, he noted, made that point "crystal clear." A copy of Furlong's letter of February 9, 1970, was resubmitted to the sisters who were urged to give consideration to the more than 200 applications received by the Bank.

The sisters responded by letter dated Memorial Day, 1970. They referred to the meeting held prior to the will's execution in which the testator said that he had made no commitments to anyone and that his sisters knew and would carry out his final wishes and desires. They pointed out that there was no mention, insinuation, or suggestion that the Bank would present a list. The letter stated that Stuart's meetings with any of the educators and heads of schools, colleges, and institutions "of every kind was solely to help his decision in choosing the strongest school for the financial betterment of Chicago as a financial center." It was further stated that the testator "desired that three-quarters of his total estate be given to establish such a school to make it a strong and permanent institution for Chicago." A plea to not let the matter become an acrimonious controversy was made, along with a suggestion that an attorney from Mayer, Brown and Platt act as a mediator.

Elizabeth Stuart testified at trial that they wrote this letter because the Bank had treated them so badly. She admitted that the Bank officers were not permitted to come to their apartment to discuss the administration of the estate and that they had declined invitations to lunch, but explained that they could not associate anything social with settling their brother's estate. She further stated that the letters from the Bank were very vague and difficult to understand. According to her testimony, the testator had

decided to give three-quarters of the estate for his own school, and for this reason did not intend to give to any other schools. The purpose of his conversations with individuals from other educational institutions was to find out how secure his school had to be in order to be endowed for a century.

Bergstrom acknowledged the sisters' letter on June 10, 1970. He expressed the Bank's desire to be as cooperative as possible in carrying out its responsibilities under the will. The more than 200 requests were mentioned again along with the Bank's recommendations. Approximately $9 million was estimated to be available for distribution at that time. The following facts were also pointed out: there was a possibility that the estate might receive some tax refunds; the market value of the trust assets fluctuated somewhat; additional administrative expenses would be incurred; and income would be earned until distribution. Since only 1 year remained to accomplish a tremendous amount of work, the Bank again requested that the co-trustees furnish a complete list of gifts to be made.

On October 7, 1970, Mark Bates of IIT brought the original complaint in this action to the Stuart sisters' apartment for their signatures. According to Elizabeth's testimony, they had never seen the complaint before this time and Bates explained it so that they knew what they were signing. The complaint was filed by the Stuarts, in their capacities of co-executor and co-trustee under the will, and also by the Illinois Institute of Technology. It alleged, *inter alia*, that the testator had expressed his desire to the "family trustees" that a large portion of his estate should go to IIT for the construction and endowment of a school of management and finance and other purposes; the family trustees had presented a proposal submitted by IIT to the corporate trustee; the trustees had made a $5 million commitment to IIT conditioned on a matching grant of $1 million; and IIT had begun construction pursuant to its original proposal. The complaint further alleged that the family trustees considered the $5 million grant inadequate for the establishment and maintenance of a distinguished school of the kind they had envisioned; that, accordingly, it was their desire that no less than three-quarters of the charitable estate be distributed to IIT for the Stuart School; that because of their close relationship to the decedent, their wishes concerning charitable distribution should be controlling in the event of a deadlock; and, that the corporate trustee refused to include IIT among the institutions which it recommended to receive the remainder of the trust corpus. Finally, it was alleged that the positions of the family and corporate trustee resulted in a deadlock precluding final designations and distribution in compliance with the will's requirements; that it would be in the best interests of the

trust and necessary to a timely completion of distribution if the court were to direct distribution in accordance with the decision of the majority of the trustees; and that plaintiffs had no adequate remedy at law.

The relief sought by the complaint was that the court (1) find that a substantial and reasonable basis existed for an additional grant to IIT which would constitute three-fourths of the trust available for charitable distribution; (2) enter a judgment providing for such additional IIT grant; and (3) enter a judgment providing that all questions arising with respect to distribution which could not be decided by the trustees pursuant to the terms of the will be resolved by the decision of the family trustees.

Coincidentally, on the same day the complaint was filed, the Bank, by letter, proposed a revised plan of distribution. An additional grant of $3.5 million was designated for IIT, raising the total commitment to this institution to $8.5 million, the amount originally suggested in the IIT proposal. Specific grants were to be made to 19 other educational and charitable institutions and, in the event additional funds became available up to $300,000, six other charitable organizations were to receive up to $50,000 each. Any amounts over $300,000 were to be distributed proportionately among the original 19 charities. The letter stated that it was imperative that the trustees decide upon all the remaining donations to be made if their assigned task of selecting recipients was to be complete by June 29, 1971. It also restated the Bank's estimate that approximately $9 million would be available for additional gifts and possibly more, depending on the amount of income earned and a potential tax recovery.

On November 6, 1970, the Bank filed a verified answer which, among other things, denied that IIT was the only educational institution in the Chicago area with which the decedent was associated, asserting instead that Stuart was interested in the welfare of several other educational and charitable institutions in the Chicago area and elsewhere, recognizing that his estate was of sufficient size to permit significant grants which would be of great benefit to a number of deserving charitable institutions. The defendant further averred that the decedent's wishes would best be carried out, and a more appropriate disposition made, if sizeable grants were made to several charitable institutions. The answer denied that no distributions had been made to charities other than the Society of Cincinnati, the Kenilworth Historical Society, and IIT, claiming that the trustees by unanimous agreement made a grant of $250,000 to the New Chicago Foundation.

The answer further denied that the wishes of the individual trustees should be given greater weight than the judgment of the corporate trustee or that their wishes should be controlling in the event of a disagreement. In addition, the Bank set forth the proposed distribution outlined in its

October 7, 1970 letter to the sisters. The answer admitted disagreement among the trustees insofar as the Bank proposed a total gift of $8.5 million to IIT, while the individual trustees demanded a grant to IIT equal to three-quarters of the available trust assets, but denied that disagreement existed as to the other charitable institutions inasmuch as the individual trustees neither accepted nor rejected its proposal as to distribution of the balance of the trust. Finally, the defendant admitted that it was in the best interest of the trust and necessary to a timely distribution that the court direct distribution, but asserted that Article Seventh of the will indicated an intention on the part of the decedent that the decision of the corporate trustee, and not that of the individual trustees, should control in the event of a disagreement, and that distribution should be directed in accordance with the defendant's proposal.

Approximately 8 months later, the Bank, by letter dated June 15, 1971, advised the sisters that as of that date they had agreed on four commitments: $5 million to IIT; $600,000 to the Kenilworth Historical Society; $550,000 to the Society of Cincinnati; and $250,000 to the Chicago Foundation for Cultural Development. The Bank reiterated its endorsement of the selections contained in the October 7, 1970 letter, with the exception of the additional grant to IIT which, according to the letter, had been included to round out a program which it had thought would be acceptable to the sisters. Because it did not accomplish that purpose, and in view of its feeling that the additional amount would be better used for other purposes, the Bank withdrew that part of its proposal and reallocated those funds. The corporate trustee then set forth its final proposal which was as follows:

1. Make specific dollar commitments to the following institutions:

| | |
|---|---|
| a. The University of Chicago | $1,000,000 |
| b. Northwestern University | 1,000,000 |
| c. Loyola University of Chicago | 1,000,000 |
| d. DePaul University | 1,000,000 |
| e. Chicago Historical Society | 500,000 |
| f. Blackburn College | 300,000 |
| g. The Art Institute of Chicago | 1,000,000 |
| h. Chicago Symphony Orchestra | 1,000,000 |
| i. Field Museum of Natural History | 1,000,000 |
| j. Mercy Hospital | 250,000 |
| k. Michael Reese Hospital | 250,000 |
| l. Presbyterian-St. Luke's Hospital | 250,000 |
| m. Children's Memorial Hospital | 250,000 |

2. Make fractional share commitments to the following institutions each to receive the dollar amount indicated or one-

ninth of the remainder of the trust (*i.e.*, excluding specific dollar amount gifts), whichever is smaller, when such remainder is finally determined:

|   |   |   |
|---|---|---|
| a. | Lyric Opera | $200,000 |
| b. | Union League Foundation for Boys Clubs | 150,000 |
| c. | Chicago Boys Club | 100,000 |
| d. | Central YMCA Community College and High School | 100,000 |
| e. | The Salvation Army— Chicago Chapter | 100,000 |
| f. | The American Red Cross— Chicago Chapter | 100,000 |
| g. | The Boy Scouts of America— Chicago Chapter | 50,000 |
| h. | The Girl Scouts of America— Chicago Chapter | 50,000 |
| i. | The Rehabilitation Institute of Chicago | 25,000 |

3. Any amount remaining after these gifts will be allocated in equal shares among the following:

> Museum of Science and Industry
> Chicago Educational TV
> Lake Forest College
> Berea College
> Union College
> Rockford College

provided, however, that if the amount remaining to be allocated to this group number 3 shall exceed $300,000, each of this group shall receive $50,000 and the residual amount shall be allocated among the institutions listed in groups number 1 and 2 on a proportionate basis. (Each institution listed in groups number 1 and 2 shall receive that part of the amount in excess of $300,000 as bears the same proportion to such excess amount as does the dollar amount specified for that institution under the terms of group number 1 or 2 bears to the total dollar amount specified for all the institutions under groups number 1 and 2.)

This plan of distribution was incorporated into an amended answer which was filed by the Bank on June 22, 1971.

The Stuart sisters, in a letter to the Bank dated June 22, 1971, pointed out that there was agreement between the trustees only on the grants to IIT, the Kenilworth Historical Society, and the Society of Cincinnati. They specifically denied having any knowledge of or approving a grant to

the Chicago Foundation for Cultural Development in the amount of $250,000. The Bank's June 15, 1971, plan of distribution was rejected as unacceptable and in contravention of the testator's wishes. The sisters stated that their brother's predominant desire was to establish a preeminent school of management and finance at IIT; after this, to expand the cultural services of the Art Institute by providing funds for construction of an auditorium; and to provide two other gifts to the Kenilworth Historical Society and the Society of Cincinnati. Their plan for distribution of the remainder of the estate made the following commitments:

| | |
|---|---|
| Illinois Institute of Technology | $4,000,000 |
| Art Institute of Chicago | 5,000,000 |
| Kenilworth Historical Society | 30,000 |

The gift to the Art Institute was to be reduced, but not below $2.5 million, to the extent necessary to give IIT at least 75 percent of the total amount of the estate passing to all charities. Any remaining funds were to go to IIT to provide additional endowment for the school.

On June 29, 1971, the plaintiffs filed an amended complaint which contained four counts. The first count, brought by the sisters, sought a finding and judgment that the defendant had breached the trust provisions of the will, and that it be required to repay the $250,000 improperly distributed to the New Chicago Foundation and disqualified from participating in the selection of any charitable beneficiaries. The second count was brought by the sisters and IIT to have the corpus of the trust distributed in accordance with their letter of June 22, 1971, and to have the remainder interests in the two trusts created for the sisters' benefit to be disposed of as follows: if the funds remaining in the trust of the sister first to die equal or exceed $500,000 at her death, a grant in that amount was to be made to the Chicago Historical Society; if the funds in the trust of the surviving sister equalled or exceeded $500,000 at her death, a grant in that amount was to be made to the Newberry Library; and subject to such conditional grants, the remainder interests in both trusts were to go to IIT. In addition, count II requested that all questions arising with respect to the distribution which could not be resolved pursuant to the terms of the will be resolved by decision of the family trustees. Counts III and IV were brought by IIT alone. Count III prayed in the alternative that an additional grant of $3.5 million be distributed to IIT in discharge of a "vested grant" which resulted from concurrent and conjoint specification and designation by all the trustees. The fourth count, alternatively, prayed that the court find and decree that the remainder interests in the personal trusts vested an interest in IIT which was to be enjoyed after termination of the life estates of the respective personal trusts.

In its answer, the Bank, *inter alia*, denied that the distribution to the Chicago Foundation for Cultural Development was not approved by the individual trustees, and admitted that it had made no designation of charitable organizations to receive the remainders after the life trusts, but averred that its failure to act prior to the termination of such trusts was in accordance with the terms of the will.

On September 15, 1971, the plaintiffs filed a motion for judgment on the pleadings with respect to the interpretation of Article Seventh of the will. The trial court denied this motion on December 22, 1971. Thereafter, 27 charitable organizations named in the proposals of the corporate and/or individual trustees were granted leave to intervene.

The case proceeded to trial without a jury on January 14, 1974 and on November 15, 1974, the court entered its judgment. The $250,000 grant to the Chicago Foundation for Cultural Development was approved as proper and consistent with the terms of the will. The plan of distribution proposed by the Bank was approved and adopted by the court. As to count III, the court also found for the defendants. However, on count IV, the court found for the plaintiff, determining that the designation by the individual trustees of the remaindermen of the life trusts was fair, equitable and proper and directing distribution in accordance therewith on the respective deaths of the life tenants.

On December 2, 1974, the sisters filed a motion for an order approving payment from the trust estate of $25,000 for trustees fees to each of them; $2,727.38 for litigation expenses and $194,800 for attorneys fees. Subsequently, the Bank moved for entry of an order approving from the trust estate payment of $125,000 for trustees fees, and to its attorneys, $3,813.30 for litigation expenses, and $174,281 for attorneys fees. Thirteen of the intervening charities filed objections to the motion of the individual trustees. They contended that the motion was devoid of any facts showing that the petitioners rendered any services on behalf of the trust and that they, together with IIT, instituted the litigation in furtherance of their personal plan of distribution which was not found to have any foundation in law or fact. They further alleged that payment of fees to the petitioners' counsel for any time expended on behalf of IIT would be a charge against the distributive share of almost all of the charities involved in the proceeding and that fees and expenses incurred with respect to the part of the proceeding related to the two separate trusts established for the sisters should be chargeable, if at all, to the two separate trusts established for the petitioners and not to the distributive share of respondents.

Thereafter, the Attorney General appeared as amicus curiae in this matter. He proposed that the court (1) distinguish between an

appropriate hourly rate for court time and for office time for legal work performed by the petitioners; (2) require a hearing to review time records submitted by both petitioners and review the applicable hourly rate for each member of the respective law firms involved therein; and (3) with respect to fees for the co-trustees, require a prove-up as to the task and time involved by the co-trustees.

Fee hearings were conducted in January 1975. Subsequently, the individual trustees amended their motion requesting approval of $25,000 for co-trustees fees, $10,777.59 for litigation expenses and $150,000 for attorneys fees, the latter reflecting a reduction of almost $45,000. The corporate trustee's petition sought $125,000 for trustee's fees, $54.20 for litigation expenses and $172,107 for attorneys fees. On March 18, 1975, after considering the evidence offered by the parties and certain intervenors, the court approved the fees and expenses requested by the petitioners, except that it approved only $100,000 for the corporate trustee's fees.

■■ The first issue raised on appeal is whether the Bank's payment of $250,000 from the Stuart estate for the use and benefit of the *Chicago Magazine* was a breach of trust either because it was made without the approval of the individual trustees or because it was contrary to the terms of the trust instrument defining qualified charitable organizations. Plaintiffs contend that the Bank unilaterally transferred the assets to an organization which it knew to be an improper beneficiary; deceived its co-trustees, and withheld the fact of such distribution until litigation had been instituted.

First, we note that the grant was appropriate, considering the testator's great interest in building Chicago into a recognized and respected financial center in competition with New York. His concern was consistent with the purpose of the *Chicago Magazine* which was to print articles typical of Chicago, relating the city's story from the standpoint of the people who lived and worked there. Copies were to be distributed locally and abroad with the intent of breaking down unfavorable stereotyped images of Chicago. Second, while it is undisputed that the *Chicago Magazine* was not recognized by the Internal Revenue Service as a charitable organization exempt under section 501(c)(3) of the Internal Revenue Code as required by the will, the grant itself was made to the Chicago Foundation for Cultural Development which received and disbursed tax-exempt, charitable grants for the advancement of activities of the Mayor's Committee for Economic and Cultural Development. The Chicago Foundation was, in fact, a qualified charitable organization under section 501(c)(3). Thereafter, the funds were transferred to the New Chicago Foundation, a civic organization exempt under section 501(c)(4), but not 501(c)(3). Both sections exempt qualified organizations

from Federal income tax; however, contributions to section 501(c)(3) charities are also deductible as charitable gifts in the computation of estate taxes.

Admittedly, the corporate trustee failed to transmit the written authorization, prepared pursuant to Kennedy's directive, to the individual trustees. While we find no evidence to support plaintiffs' contention that this was a duplicitous concealment from the co-trustees, it is clear that the appropriate procedure would have been to obtain the formal consent of the co-trustees. However, we are unwilling to say that the trial court abused its discretion in approving the gift, even though the co-trustees would not join in the request to pay it, as the judge found.

The second and third issues raised by plaintiffs involve a provision of Article Seventh of the will which states:

> "A majority of the Trustees or of the Executors, as the case may be, may take any action hereunder with the same force and effect as though all the Trustees or Executors had joined therein, *provided that the corporate Trustee or corporate Executor shall be one of such majority.* If at any time there shall be only one individual Trustee or Executor surviving, then in the event of any disagreement between the two Trustees or Executors, the determination of the corporate Trustee or corporate Executor shall control." (Emphasis added.)

Plaintiffs posit that the majority rule governing charitable trusts in effect during the relevant period provided, in pertinent part "[w]hen more than two trustees are required to execute a trust, a majority of the trustees shall be competent to act in all cases, * * * unless the instrument or authority creating the trust shall otherwise provide." (Ill. Rev. Stat. 1963, ch. 148, par. 33.) It is argued that the Bank had the burden of establishing that the will otherwise provided and that the Bank's interpretation of the will resulted in a deadlock throwing the matter into court—the very consequence the statute was intended to avoid. Accordingly, they submit that the Bank's role under the will was to resolve disagreements between the individual trustees, and not to veto otherwise permissible discretionary actions approved by both of the individual trustees. They buttress this position by urging that the preference for majority rule should be given full effect in relation to the exercise of broad discretionary powers as in the instant case.

■■ It is fundamental that the primary object in construing a will is to ascertain and effectuate the intention of the testator. (*Joslin v. Ashelford* (1961), 29 Ill. App. 2d 202, 209, 172 N.E.2d 806.) The intent manifested in a will is determined in either of two ways: by ascertaining the testator's actual meaning from the words employed, to which all rules of construction yield, or by finding his presumed intention by the

application of rules of construction where the meaning is obscure, doubtful or uncertain. (*Crockett v. Baker* (1969), 106 Ill. App. 2d 44, 49, 245 N.E.2d 257; *Horton v. Ferris* (1962), 24 Ill. 2d 32, 34, 179 N.E.2d 680.) We believe that the testator's intention can be gathered from the language of the will and, further, that the meaning of Article Seventh is neither ambiguous nor vague. Therefore, resort to the rules of construction cited in plaintiffs' brief is unnecessary.

■■ The proviso of the above quoted clause expressly states that the corporate trustee shall be one of the majority. In our opinion, by using those words, the testator meant that effective action could be taken by two trustees if, and only if, the corporate trustee was one of the two. Therefore, the two individual trustees could not act without the Bank's concurrence. Furthermore, by inserting such a proviso, the testator unambiguously brought the will outside of the statute relied on by the plaintiffs concerning majority rule. Since the will is not silent on this point, its express provision is dispositive of the issue. It is the intention expressed, and not that which is presumed to have been on the testator's mind, which is controlling.

This interpretation is also consistent with the sentence following the proviso which states that if at any time there is only one individual trustee surviving, the determination of the corporate trustee shall control in the event of a disagreement between the two trustees. We believe that this grant of decision-making power to the corporate rather than the individual trustees is further expression and manifestation of the testator's intent to have the Bank play a definitive and decisive role. This is reasonable considering the potential value of the estate and the corporate trustee's expertise in trust administration. Conversely, it is somewhat less likely that the testator intended his elderly sisters to assume the full responsibility in handling complex administrative duties.

In addition, an interpretation which permits a majority of the trustees to act if, and only if, the corporate trustee is party of such majority is reasonable both in the context of Article Seventh and the entire will. If the testator had intended to rely primarily on the judgment of the individual trustees, because of their purported knowledge of what he wanted, it seems unlikely that upon the death of one, the controlling power would abruptly transfer to the corporate trustee. Again, it is the intention expressed, and not that which is presumed to have been in mind, that is controlling. On the other hand, under the interpretation adopted by this court, the role of the Bank is consistent; for whenever a disagreement arose, the majority, which must include the Bank, would control; and if only one individual trustee was surviving, the determination of the corporate trustee would control.

■■ It is true, as plaintiffs point out, that this interpretation of the

clause poses the possibility of a three-way stalemate. They contend, therefore, that the proper interpretation of the entire majority clause is as a direction to the corporate trustee to act so as to bring about a majority vote; in other words, the corporate trustee is not to choose its own plan but rather to join one or the other of the individual trustees. While this construction would clearly provide a mechanism for trustee action without litigation, it cannot be reconciled with the plain meaning of the words employed by the testator. To hold in accordance with that position, this court, in effect, would have to delete the proviso from the Article, and relegate the Bank's role to one of a tie breaker if the individual trustees disagree with each other. However, rejection of words from a will must be warranted by the context or scheme of the will, and not merely by a conjectural hypothesis of the testator's intention (*Hays v. Illinois Industrial Home for the Blind* (1958), 12 Ill. 2d 625, 629, 147 N.E.2d 287), and we find nothing in the will which makes it certain that the expressed intention of the testator necessitates or authorizes the deletion. Notwithstanding Elizabeth's testimony that the testator explained the majority clause as giving the Bank a tie-breaker role, the will provides no basis for the conclusion that Stuart intended the Bank to facilitate decisions by concurring with one of the individual trustees, and not to utilize its own judgment. To assign a different role to the corporate trustee, we would contravene the established rule that courts are without power to change or draft new wills under the guise of interpretation. *Domke v. McCue* (1969), 110 Ill. App. 2d 1, 4, 249 N.E.2d 287.

In the alternative, plaintiffs argue that the court should have resolved the controversy on the basis of majority rule, since the decision of the majority was not illegal, contrary to the terms of the trust or otherwise an abuse of discretion, and should have granted their motion for judgment on the pleadings. *Continental Illinois National Bank & Trust Co. v. Sever* (1946), 393 Ill. 81, 65 N.E.2d 385, is cited as support for the proposition that courts of equity will not interfere with the exercise of discretionary power of a trustee in the absence of fraud, bad faith, or abuse of discretion, and will not undertake to exercise a discretion left to the trustee. In *Sever*, the testator left the residuary of his estate in trust for the establishment of an institution of learning. When the trustee petitioned for instructions, the court appointed a committee to consider applications for use of the funds. The committee recommended both St. Louis University and Washington University. The trustee selected the latter and litigation ensued. The trial court ordered the fund to be used to establish an autonomous school at St. Louis University. However, the Illinois Supreme Court upheld the appellate court's reversal of this order, holding that the trustee was required to exercise its own authority to select an appropriate educational institution.

■■ *Sever*, in our opinion, is inapplicable to the majority rule issue in the instant case for several reasons. That case involved only one trustee; therefore, no deadlock situation was presented. In addition, the trustee did not attempt to exercise its discretionary power to select and establish an institute, but instead petitioned the court for detailed instructions concerning the performance of these duties. Here, the trustees clearly exercised their discretion by nominating various charities for grants. Consequently, in deciding this case, the court was attempting not to substitute its judgment for that of the trustees but only to determine which of the competing schemes of disposition was to be adopted. The trial judge was correct in concluding that the issues required a trial, and, therefore, his denial of plaintiffs' motion for judgment on the pleadings was proper.

■■ Plaintiffs next urge that if a trial on the merits was required, the trial court's rejection of the individual trustees' plan was contrary to the evidence. They suggest that the court should have considered certain guidelines, drawn by analogy from the rules which guide courts in framing plans for distribution of charitable trusts under other circumstances, in determination of such a plan. These guidelines recommend considering the probable desires of the testator, such as the character of the gifts previously made or in which he expressed an interest; giving weight to the wishes of the testator; and hearing testimony concerning the testator's interest and tastes, particularly from his relatives. Plaintiffs submit that the evidence introduced in support of their plan of distribution met this standard.

Elizabeth Stuart testified in detail concerning the testator's interests and plans for distribution of his estate; however, the trial judge was not required to accept her testimony to the exclusion of all the other testimony. Although her statement that Stuart had given the sisters a list of intended beneficiaries was not incredible on its face, it was in conflict with other testimony that the testator had no preferences and intended to rely on his trustees. It was also inconsistent, at best, with the fact that the testator never disclosed such a list to the corporate trustee whose concurrence was required before a majority of the trustees could act. Moreover, the evidence disclosed that the corporate trustee did attempt to frame a scheme which was consistent with Stuart's interests insofar as they could be discerned. There was testimony that a bank officer read Stuart's business diary, making notations on visits with charitable representatives; that interviews were conducted with members of the Halsey, Stuart & Co. staff with whom the testator had close business contact; that his tax returns were reviewed for evidence of past charitable donations. In addition, attempts were made to learn about the sisters' ideas on distribution, but efforts in this direction were thwarted by their

refusal to meet with Bank representatives. We believe that the trial judge's decision to adopt the plan of the corporate trustee was amply supported by the evidence. Where the decision of the trier of fact is not against the manifest weight of the evidence, it will not be disturbed by a reviewing court. (*Lipschultz v. So-Jess Management Corp.* (1967), 89 Ill. App. 2d 192, 203, 232 N.E.2d 485.) This court is bound by the rule that where the trial court has seen and heard the witnesses and the testimony is contradictory, the reviewing court will not substitute its judgment as to the credibility of witnesses for that of the trial court and will not disturb the findings unless they are manifestly against the weight of the evidence. (*Ezydorski v. Krozka* (1961), 31 Ill. App. 2d 79, 175 N.E.2d 668.) In order for a decision of the trial court to be contrary to the manifest weight of the evidence, where the evidence is conflicting, an opposite conclusion must be clearly apparent. *Olin Industries, Inc. v. Wuellner* (1954), 1 Ill. App. 2d 267, 271, 117 N.E.2d 565.

■■ Plaintiffs next charge that the trial court committed certain errors in adopting the Bank's plan  The first assignment of error concerns the Bank's failure to show how the funds would be used by the recipients. However, this contention ignores the fact that the will left the allocation of the funds as well as selection of recipients to the discretion of the trustees. Such power must be presumed to have been conferred by reason of the confidence reposed in them by the testator. The court was not bound to inquire into the recipients' proposed use of the funds and then balance the virtues of diverse plans and programs, particularly since no claim has been made that any of the nominees were less than deserving.

■■ We also find no merit to plaintiffs' second assignment of error which concerns the trial court's refusal to consider the comparative needs of all the charities selected by the individual and corporate trustees. To reverse on this ground, this court would be injecting a new criterion into the selection process; one which has no support in the will since no requirement was made that the money go to "needy" charities. The well-established rule in this State is that courts of equity will not interfere with the exercise of discretionary power in the absence of fraud, bad faith or abuse of discretion. (*Continental National Bank & Trust Co. v. Sever* (1946), 393 Ill. 81, 93, 65 N.E.2d 385; *Koenig v. Bickel* (1949), 338 Ill. App. 21, 28, 86 N.E.2d 827.) If the court should interfere while the trustee is acting bona fide, it would be a substitution of the discretion of the court for that of the trustees, contrary to the will of the testator. (*Martin v. McCune* (1925), 318 Ill. 585, 590-91, 149 N.E. 489.) By the same reasoning, we find no error in the trial court's adoption of the Bank's plan notwithstanding the fact that certain charities will receive a substantial increase in allocation through the pro rata distribution of the trust residue which will be significantly larger than originally estimated.

Plaintiffs next argue that a new trial should be granted because the

judge (1) improperly restricted their pretrial discovery of the use of funds by certain bank-designated charities; (2) improperly refused to consider evidence showing the financial needs of the Stuart School; and (3) erroneously refused to consider evidence of the endowment of all educational institutions seeking funds. Their contentions are that the discovery information was in the scope of proper inquiry since competing plans were being considered and that the compelling financial needs of the Stuart School as compared to those of the other educational institutions in the Bank's proposal justified rejection of that plan.

■■ Trial courts have, of necessity, broad discretionary power to insure a fair, just and orderly trial (*Wright v. Royse* (1963), 43 Ill. App. 2d 267, 287, 193 N.E.2d 340), including wide discretion to control the taking of discovery. (*People ex rel. General Motors Corp. v. Bua* (1967), 37 Ill. 2d 180, 193, 226 N.E.2d 6; Ill. Rev. Stat. 1973, ch. 110A, par. 201(c).) The financial need of the various institutions was not in issue, and not relevant to a determination of which of two trustee plans should be adopted, where all intended recipients were qualified charitable organizations or institutions. To inject a multitude of issues which are not probative of anything which the trial court was required to decide would do nothing more than confuse the real issues and waste judicial time. Under the circumstances shown here, we believe that the trial judge properly decided the issue of relevance, and properly refused to permit discovery of or to consider evidence which lacked probative value.

■■ The next assignment of error concerns the trial court's refusal to admit Stuart's prior will into evidence. The three-fold purpose of the offer was to show that the testator had named his sisters as executors therein; to show that it was the Bank that sought Stuart and not that he really wanted the Bank to decide what to do with his money; and, to impeach the testimony of David Kennedy who testified that Stuart told him in 1964 that he had no will. We feel that the trial court was correct in excluding the prior will. This document, executed on August 7, 1942, preceded the current will by nearly 22 years. On this basis alone, its probative value is clearly diminished. Further, the prior will left the entire estate, after payment of debts and expenses, to the sisters—no charitable gifts were bequeathed. The dispositive provisions of the two wills are so completely dissimilar as to negate any serious contention of relevance to the issues involved in this litigation. We also fail to see how the 1942 will could be used to impeach Kennedy's testimony when the witness knew at the time of trial, and so testified, that the decedent in fact had a prior will, even though he also stated that the decedent had indicated that he did not have a will. Moreover, the existence of a prior will was undisputed. The trial court properly looked only to the latest will, and we find no error in its refusal to admit the 1942 will into evidence.

Plaintiff IIT presents the unique argument that it enjoys a vested right to

receive an additional $3.5 million from the charitable trust because all of the trustees made "written selections" of IIT to receive the additional grant within 5 years of Stuart's death. Article Fifth of the will, on which IIT relies, provides in pertinent part:

> "Such distribution to qualified charitable organizations shall take place not more than five (5) years after my death. If for any reason it shall not be possible or practicable to complete distribution within that time, the Executors shall, prior to the expiration of such period of five (5) years after my death, select in writing the qualified charitable organizations to take hereunder and the proportion of my estate each such organization is to receive, and the interest of each such charitable organization shall vest at the expiration of such five year period."

IIT reasons that the sisters by formal statement of intent, dated October 10, 1968, directed that an $8.5 million grant be made to the institute. This statement was never withdrawn and the amount never reduced, even though the individual trustees subsequently agreed to the $5 million grant. In the Memorial Day 1970 letter, they mentioned the purported desire of their brother to give IIT three-fourths of his total estate, an amount which was roughly equivalent to $8.5 million, based on the $11 million originally estimated by the Bank to be available for distribution. Similarly, it is argued, the Bank by letter dated October 7, 1970, also designated IIT to receive $3.5 million, thus giving the institute a vested right to the additional amount. Plaintiff also points out that the Bank in its verified answer to the original complaint stated "there is a disagreement among the trustees insofar as defendant proposes a total grant of $8.5 million to IIT while the individual trustees demand a grant to IIT equal to three-quarters of the available trust assets," and that it would be in the best interests of the trust and consistent with the decedent's intent to direct distribution in accordance with the Bank's suggestions. It is further urged that the Bank lacked the power to revoke its earlier written selection of IIT to receive $3.5 million under the "equitable rule" demanding that a fiduciary must not barter or trade off his vote for a quid pro quo from a co-fiduciary.

Notwithstanding these contentions, we find no evidence that all the trustees simultaneously intended to select IIT for an additonal $3.5 million grant. This view is supported by a brief review of the chronology of negotiations. From October 10, 1968, the date of the sisters' statement of intent, to the beginning of April 1969, there was no mutual agreement that IIT should receive $8.5 million. On April 3, 1969, all the trustees did agree to a $5 million gift. However, on Memorial Day 1970, when the sisters notified the Bank of their desire to grant an additional amount to IIT, they designated an amount which would equal three-quarters of the total

estate. The fact that they specified three-fourths of the fund, as opposed to the difference between the $8.5 million proposal and the $5 million grant, indicates, in our opinion, that they did not intend to limit IIT to $3.5 million. This is a reasonable inference since the sisters knew that the estate assets were increasing as a result of interest earned, and that there was a potential tax recovery. When the corporate trustee proposed an additional grant to IIT of $3.5 million as part of its total program on October 7, 1970, the sisters, on the same date, petitioned the court to enter a judgment providing for an additional grant to IIT which, together with the original grant, would constitute three-fourths of the total estate.

■■ Both parties cite *Williams v. Watkins* (1923), 93 Okla. 112, 114, 219 P. 643, as authority for the proposition that the act of selecting presupposes an intention formed in the mind to do or not do a thing. Accordingly, in order to have effectively selected IIT for the $3.5 million, it would have to be shown that the individual and corporate trustees formed such intention. However, it is evident that only the corporate trustee proposed that IIT receive this amount. The sisters' proposal was so materially different that it cannot be reasonably said that there was a meeting of the minds. We therefore find no merit to IIT's contention that it was selected in writing under Article Fifth and thereby entitled to a vested right to receive $3.5 million from the charitable trust.

■■ Plaintiff IIT cites no authority for the purported equitable rule which proscribes bartering votes for quid pro quo from co-fiduciaries. However, accepting this "rule," *arguendo*, we find no impermissible action by the Bank in this matter. Certainly reasonable persons may differ over schemes of disposition for a $22 million charitable trust. It is equally clear that, as a general rule, a trustee may not delegate to a co-trustee duties which involve the exercise of discretion or judgment. (*In re Will of Hartzell* (1963), 43 Ill. App. 2d 118, 134, 192 N.E.2d 697.) Neither the corporate trustee nor the individual trustees were required to accept proposals from the others without question; however, since the testator appointed several trustees, it is not unreasonable to assume that he intended that they reach a mutually agreeable plan. In our opinion, the Bank exercised the requisite standard of care, prudence, and diligence in the performance of its duties, and we do not believe that its good faith attempts to both satisfy the sisters' desires and exercise its own judgment contravened any established equitable rules.

The only remaining issue that this court finds necessary to reach is raised by certain intervening charities (intervenors hereinafter) who challenge the propriety of the trial court's order granting litigation expenses and fees to the individual trustees and attorneys fees to their counsel. Intervenors allege that these fees were not a proper charge against the charitable trust because (1) the litigation was unnecessary, the

fault of the sisters, and not in the best interests of the trust; (2) the individual trustees lacked authority to engage separate counsel at the expense of the trust; (3) the individual trustees failed to establish by clear and convincing evidence their right to compensation from the trust fund; and (4) the sisters' trusts should bear a portion of the fees since the issues in the case cut across all the trusts. Alternatively, it is argued that the court should have allocated the requested attorneys fees to reflect the services rendered by the sisters' attorneys for the benefit of IIT and in connection with the sisters' trusts.

Louis S. Hardin, an attorney and partner of the law firm which was general counsel for IIT, testified in the fee hearings that in June 1970, he and certain representatives of IIT discussed the possibility of litigation or further proceedings concerning the Stuart estate. About June 11, the Stuart sisters telephoned him, and asked to be represented in the matter. They were concerned because no additonal gift had been made to IIT other than the $5 million, and asked that he present the matter to the Bank. They also indicated their intention to sue the Bank if no progress was made. Hardin stated that he personally knew Clare Furlong, the senior vice president in charge of the Bank's trust department, and was reasonably certain that they could work out something. The sisters refused to permit the attorney to meet with them because they did not want to be influenced and because they wanted to avoid any charges of being influenced.

Hardin testified that he had two meetings at Continental in July. In his second meeting on July 20, he realized that it was an absolute impasse: the Bank refused to agree to a single gift unless all the gifts were agreed upon, while the sisters took the position that the additional gift to IIT had to be approved before they would endorse anything else. Hardin called Furlong five or six times between July 20 and October 7, but no progress was made.

■■ It can hardly be said that litigation is uncalled for in a situation where co-trustees are deadlocked. We believe that the irreconcilable conflict between the corporate and individual trustees necessitated a final judicial resolution. Under the terms of the will, the charitable selections were to be completed within 5 years of the decedent's death and, at the time this suit was instituted, it appeared highly unlikely that this requirement would be met. A trustee may seek the aid and direction of a court of equity in the management of a trust (*Strawn v. Trustees of the Jacksonville Female Academy* (1909), 240 Ill. 111, 116, 88 N.E. 460), and in our opinion the action of the individual trustees was not unwarranted.

Intervenors contend that because the trustees were required to act as an entity, the sisters, as minority trustees, were not entitled to engage their

own attorneys at the expense of the trust, citing *In re Estate of Greenberg* (1957), 15 Ill. App. 2d 414, 146 N.E.2d 404, as support. The issue in *Greenberg* was whether a single co-executor had the right to employ independent counsel in his capacity as co-executor, contrary to the express opposition of the majority of the co-executors and the directive of the will providing for majority control, where counsel fees would be paid from estate funds. The court found that the principle of majority control applied to the employment of legal counsel in administration matters; therefore, since any honest differences of opinion would be resolved by majority control, a minority executor could not change his status by employment of additional counsel. It concluded that because the estate was properly administered, as the co-executor conceded, there was no right to have independent counsel available to check upon the decisions agreed upon by the other co-executors.

■■ We believe that *Greenberg* is inapplicable to the situation at bar. While the Stuart will did provide for majority control, as long as the Bank was one of such majority, there was clearly no effective majority which could act. The trustees were deadlocked with the two individual trustees on one side and the corporate trustee on the other. Counsel was not employed by the sisters for mere consultation in administrative matters, but to vindicate what they perceived as their right to select and fund certain charitable organizations. Moreover, the legal services rendered by their attorneys directly related to and were reasonably incurred in the performance of the trustees' duty to complete the selections within 5 years of the decedent's death. Further support may be found in Article Seventh of the will which expressly states: "My Trustees may employ such agents or attorneys as they may from time to time *deem necessary and advisable* in the administration of the trust estates, and may pay the compensation and expenses of such agents or attorneys, as well as their own compensation, out of the trust estates." [Emphasis added.] For these reasons we believe that the sisters, in this peculiar situation, were entitled to engage separate counsel and that the awarding of attorney and litigation fees did not constitute an abuse of discretion since there was an honest difference of opinion between the parties (accord, *Orme v. Northern Trust Co.* (1962), 25 Ill. 2d 151, 165, 183 N.E.2d 505; *St. Louis Union Trust Co. v. Hearne* (1969), 111 Ill. App. 2d 411, 425, 250 N.E.2d 674), which resulted in a deadlock, and because the specified time limit in which they were required to act was close to expiration. The general rule is that expenses incident to the preservation of a trust or for the benefit thereof are properly chargeable against and reimburseable from the trust estate, and such rule does not condition the assessment of fees and costs dependent upon the outcome of the litigation and does not require that

such fees and costs be assessed against the unsuccessful party. *(Brown v. Commercial National Bank* (1968), 94 Ill. App. 2d 273, 280, 237 N.E.2d 567.) Accordingly, we find no error.

■■ Intervenors' contention that the individual trustees are not entitled to trustees' fees is without merit. "An Act concerning compensation of trustees" (Ill. Rev. Stat. 1965, ch. 148, par. 31), in effect during the relevant period, authorizes compensation to trustees of a charitable trust created by will where there is no provision made in the instrument itself regarding compensation. However, the Stuart will does provide that compensation for the trustees may be paid out of the trust estate, evidencing an intent, we think, that the trustees should be rewarded for their services. It is for the trial court alone to determine both the justness of the claim and the amount in light of all the facts, circumstances, and character of the services rendered. *(Gorin v. McFarland* (1967), 80 Ill. App. 2d 398, 422-23, 224 N.E.2d 615.) While the sisters were adamant in their position, we do not believe that they committed any breaches of trust by their actions. Therefore, since there was ample evidence in the record to support the sisters' claim, the order will not be reversed on appeal.

■■ Because the litigation also involved the designation of the remaindermen of the life trusts created for the sisters, intervenors argue that these trusts should bear a portion of the fees and expenses. However, we cannot say that the trial court abused its discretion in failing to allocate costs, considering that the principle issues focused on distribution of the general charitable trust, that such allocation decisions would have been difficult to make and somewhat arbitrary, that the assets of the general charitable trust greatly exceeded those of the two life trusts, and that all of the trusts would be eventually distributed to charity.

■■ Finally, intervenors contend that the court should have allocated the attorneys fees charges to the individual trustees to reflect the services which were in reality rendered on behalf of IIT. They point out that the law firm which represented the sisters had been retained as outside counsel for IIT for several years and was representing the institution in this suit until it withdrew in September 1972. On the other hand, it must be noted that the trial judge was cognizant of the 2-year period of dual representation by this law firm and expressed his concern. He suggested that the amount of fees sought for this period be divided between the individual trustees and IIT. Plaintiffs' evidence showed that the fees incurred during this time amounted to approximately $70,000. Thereafter, the attorneys for the individual trustees voluntarily amended their attorneys fee request, reducing it from $194,800 to $150,000. We believe that this $44,800 reduction was made in acknowledgment of the objections raised by intervenors and the suggestions offered by the

Attorney General who appeared as amicus curiae in the fee hearings. Accordingly, we have determined that the trial court did not abuse its discretion in failing to require any further reduction.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

ADESKO and JIGANTI, JJ., concur.