(Nos. 49070, 49074 cons

ELIZABETH B. STUART *et al.*, Appellants, v. CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO *et al.*, Appellees.

*Opinion filed Oct. 5, 1977.—Rehearing denied Nov. 23, 1977.*

504

John J. Waldron, William T. Hart, Allan Horwich, and Joan Steinman, of Schiff, Hardin & Waite, of Chicago, for appellant Elizabeth B. Stuart.

Samuel W. Witwer, J. Alfred Moran, Samuel W. Witwer, Jr., and Timothy R. Young, of Witwer, Moran, Burlage & Atkinson, of Chicago, for appellant Illinois Institute of Technology.

William A. McSwain and James O. Silliman, of

Eckhart, McSwain, Hassell & Silliman, of Chicago, for appellant Art Institute of Chicago.

Owen Rall, of Peterson, Ross, Rall, Barber & Seidel, of Chicago, for appellee Museum of Science and Industry.

Roger W. Barrett and Franklin P. Auwarter, of Mayer, Brown & Platt, of Chicago, for appellee Continental Illinois National Bank and Trust Co.

Willard L. King, of King, Robin, Gale & Pillinger, of Chicago, for appellee Chicago Historical Society.

John J. Waldron, William T. Hart, Allan Horwich, and Joan Steinman, of Schiff, Hardin & Waite, of Chicago, for appellee Northern Trust Company, executor of the estate of Harriet F. B. Stuart, deceased.

William H. Oswald, of the Office of General Counsel, Loyola University of Chicago, of Chicago, for appellee Loyola University of Chicago.

Charles E. Herzog, of Bell, Boyd, Lloyd, Haddad & Burns, of Chicago, for appellee University of Chicago.

Christopher W. Wilson, of Hopkins, Sutter, Mulroy, Davis & Cromartie, of Chicago, for appellee Blackburn College.

Rodney Joslin, of Jenner & Block, of Chicago, for appellee Girl Scouts of Chicago.

John Angle, of Kirkland and Ellis, of Chicago, for appellees Boy Scouts of America and Rehabilitation Institute.

Otis H. Halleen, of Sonnenschein, Carlin, Nath & Rosenthal, of Chicago, for appellee Michael Reese Hospital and Medical Center.

Frank J. Madden, of Boodell, Sears, Sugrue, Giambalvo & Crowley, of Chicago, for appellee Union College.

Thomas J. Russell, of Mitchell, Russell & Kelly, of Chicago, for appellee DePaul University.

Michael C. Weston, of the Office of the University Attorney, Northwestern University, of Evanston, for appellee Northwestern University.

Vernon T. Squires, of Wilson & McIlvaine, of Chicago, for appellees Field Museum of Natural History, Orchestral Association, Children's Memorial Hospital, Chicago Boys Clubs and Lake Forest College.

Stephen L. Schar, of Aaron, Aaron, Schimberg & Hess, of Chicago, for appellee American Red Cross.

John M. Rammel, of Williams, Manos, Rutstein, Goldfarb & Sharp, Ltd., of Chicago, for appellee Mercy Hospital and Medical Center.

James J. McClure, Jr., of Gardner, Carton & Douglas, of Chicago, for appellees Rush-Presbyterian-St. Luke's Hospital, Berea College, and Chicago Educational Television Association.

Lee A. Freeman, Sr., of Freeman, Rothe, Freeman & Salzman, of Chicago, for appellee Lyric Opera of Chicago.

Henry X. Dietch, of Davis, Dietch & Ryan, of Chicago, for appellee Salvation Army — Chicago Chapter.

Louis M. Rundio, Jr., of McDermott, Will & Emery, of Chicago, for appellee YMCA of Metropolitan Chicago.

MR. JUSTICE RYAN delivered the opinion of the court:

This appeal involves a dispute between a corporate co-trustee and two individual co-trustees concerning the disposition of a large charitable trust fund created by the will of Harold L. Stuart. The individual co-trustees, the sisters of the late Harold L. Stuart (hereinafter referred to

as the Stuart sisters), brought the original complaint together with a co-plaintiff, the Illinois Institute of Technology (hereinafter referred to as IIT), against the corporate co-trustee, the Continental Illinois National Bank and Trust Company (hereinafter referred to as the Continental Bank). The dispute arose because the individual co-trustees and the corporate trustee were unable to agree upon a plan of distribution. Additionally, 27 charitable organizations, which were named in the plans of distribution submitted by the co-trustees, were granted leave to intervene in the lower court. The circuit court of Cook County essentially adopted the plan of distribution submitted by the corporate co-trustee in preference to the scheme of distribution advanced by the individual co-trustees. The circuit court's judgment was affirmed in all respects by the appellate court. (*Northern Trust Co. v. Continental Illinois National Bank & Trust Co.* (1976), 43 Ill. App. 3d 169.) We granted leave to appeal pursuant to our Rule 315(a) (58 Ill. 2d R. 315(a)) and now affirm the decision of the appellate court in part, and reverse that decision in part.

The facts involved in the present appeal are lengthy and complex. A full statement of the facts is included in the opinion of the appellate court, and we shall set out only those facts necessary for an understanding of our disposition of this case.

Harold L. Stuart died on June 30, 1966. He was unmarried and was survived by his two unmarried sisters. He was a renowned financier and investment banker and was the president and sole stockholder of the investment banking firm of Halsey, Stuart and Co., Inc. All parties agree that Harold Stuart was devoted to the city of Chicago, and that his lifelong desire was to build the city into a financial center. The testator left a multimillion dollar estate which presently is valued in excess of $26 million.

Harold Stuart's will was executed on April 23, 1964. It named the Continental Bank and his two sisters as co-executors and co-trustees. The will provided for the creation of two $1 million trust funds to provide life estates for each sister with the remainders to charity. The remainder of his estate was to be distributed to qualified charitable organizations. The will did not mention specific charities, but rather vested the discretion to select charitable beneficiaries in the co-trustees. Under the will, the trustees were to select these charities within 5 years of the testator's death.

The testator's will was solicited for the Continental Bank by David M. Kennedy, who was then the chairman of the board of the bank. Kennedy recommended a senior partner of the law firm which represented the bank to draft the will, and the testator had this attorney prepare the will. Kennedy testified that he spoke with the attorney while the will was being drafted and asked that co-executors and co-trustees be named in addition to the Continental Bank. The testator was 82 years of age at the time the will was drafted, and shared a home with his two sisters in Chicago.

The trial court heard conflicting testimony concerning the testator's intentions from the time the will was executed until his death. This testimony is more fully recounted in the appellate court's opinion than shall be set forth here. In essence, however, the testimony of several bank officers was that the testator had no specific plan of distribution in mind and that he had expressed the desire that the bank be primarily responsible for the selection of the particular charities to take from his estate. The testimony of co-trustee Elizabeth Stuart was to the contrary. She testified that the testator frequently discussed his will with her and her sister, and told them that in the event of a disagreement between the two sisters the bank would cast the deciding vote. Elizabeth Stuart

further testified that the testator had orally apprised her and her sister of the charities to which gifts should be made. She stated that the testator had determined that three-quarters of his estate should be donated to IIT to construct and endow a school of finance and management. The other individual co-trustee, Harriet Stuart, did not testify at the trial.

The Continental Bank and the Stuart sisters qualified as co-executors on August 29, 1966. The testimony of the bank officer responsible for the administration of the estate indicated that the bank was inundated with requests from charitable organizations once the provisions of the will became publicly known. Approximately seven months after the testator's death, Harriet Stuart contacted IIT to receive information concerning its programs. She later requested and received additional information that her brother had attended Lewis Institute for five semesters between 1896 and 1900. Lewis Institute merged with Armour Institute in 1940 to form IIT. In May of 1968, Harriet Stuart contacted IIT and informed officials there that she and her sister desired to make a substantial grant to the institution. She requested a proposal concerning the possibility of establishing a school of management and finance. IIT prepared such a proposal and submitted it to the sisters. The proposal originally requested $7.5 million to fund the school, but this figure was subsequently raised to $8.5 million.

On October 10, 1968, the Stuart sisters filed a "Statement of Intent" with the bank in which they formally directed that IIT receive $8.5 million to establish the Harold Leonard Stuart School of Management and Finance. The officials at the Continental Bank considered the amount of this grant inappropriate. After meeting with representatives of IIT, the bank agreed to a reduced proposal in the amount of $5 million on April 3, 1969, and this amount was subsequently disbursed to IIT. The

Continental Bank and the sisters also were able to reach agreement concerning grants to the Society of Cincinnati and the Kenilworth Historical Society. The gifts to each organization were sponsored by the Stuart sisters and not the bank. Elizabeth Stuart testified that the testator had instructed her and her sister that these organizations should take under the will. A distribution of $250,000 was also made to the Chicago Foundation for Cultural Development on January 26, 1968. This distribution was made with the prior understanding that the money would be transferred to the New Chicago Foundation. As the propriety of this distribution is a central issue in this appeal, we shall set forth the salient facts surrounding the transaction in our discussion of that issue.

In the circuit court, a great deal of testimony was heard concerning the conduct of the co-trustees during the time following the testator's death until the institution of the lawsuit on October 7, 1970. Essentially, the evidence showed that the Stuart sisters and the Continental Bank were never in complete agreement as to either the identities of the charitable beneficiaries or the manner in which they would be selected. The bank was from the outset interested in distributing the estate to a large number of charities and preferred to develop a total plan for distribution. The Stuart sisters, on the other hand, were interested only in considering those charities which they asserted to have been the choices of their brother. The sisters also preferred to consider bequests to only one charity at a time. The sisters also declined to attend personal meetings with bank representatives, and, generally, did not feel that the bank should have any significant voice in the selection process.

This was the approximate state of affairs on October 7, 1970, when the Stuart sisters and IIT filed suit. The complaint requested a judgment providing for an additional grant to IIT to the extent of three-fourths of the

estate, and also sought entry of a judgment providing that all further disputes between co-trustees should be resolved by the decision of the individual co-trustees. On this same date, the Continental Bank proposed a revised plan of distribution in a letter to the Stuart sisters. Under the plan, grants were to be made to a number of charities and an additional $3.5 million was designated for IIT.

In its answer to the complaint, the bank set forth its total plan of distribution and requested that the trust be distributed in that manner. The answer also stated that the disagreement between the co-trustees was that the bank proposed a total gift of $8.5 million to IIT, whereas the Stuart sisters wanted that institution to receive three-quarters of the estate.

On June 15, 1971, the bank, by letter to the Stuart sisters, made its final proposal. This proposal adhered to the selections of charitable beneficiaries contained in the letter of October 7, 1970, with the exception that the bank no longer proposed an additional gift to IIT. The letter stated that agreement had been reached on four proposals: $5 million to IIT; $600,000 to the Kenilworth Historical Society; $550,000 to the Society of Cincinnati; and $250,000 to the Chicago Foundation for Cultural Development. The bank then proposed that the remaining funds be distributed in the following manner:

"1. Make specific dollar commitments to the following institutions:

| | |
|---|---|
| a. The University of Chicago | $1,000,000 |
| b. Northwestern University | 1,000,000 |
| c. Loyola University of Chicago | 1,000,000 |
| d. DePaul University | 1,000,000 |
| e. Chicago Historical Society | 500,000 |
| f. Blackburn College | 300,000 |
| g. The Art Institute of Chicago | 1,000,000 |
| h. Chicago Symphony Orchestra | 1,000,000 |
| i. Field Museum of Natural History | 1,000,000 |
| j. Mercy Hospital | 250,000 |
| k. Michael Reese Hospital | 250,000 |

l. Presbyterian-St. Luke's Hospital .250,000

m. Children's Memorial Hospital 250,000

2. Make fractional share commitments to the following institutions each to receive the dollar amount indicated or 1/9th of the remainder of the Trust (i.e., excluding specific dollar amount gifts), whichever is smaller, when such remainder is finally determined:

a. Lyric Opera $200,000

b. Union League Foundation for Boys Clubs 150,000

c. Chicago Boys Club 100,000

d. Central YMCA Community College and High School' 100,000

e. The Salvation Army - Chicago Chapter 100,000

f. The American Red Cross - Chicago Chapter 100,000

g. The Boy Scouts of America - Chicago Chapter 50,000

h. The Girl Scouts of America - Chicago Chapter 50,000

i. The Rehabilitation Institute of Chicago 25,000

3. Any amount remaining after these gifts will be allocated in equal shares among the following:

Museum of Science and Industry

Chicago Educational TV

Lake Forest College

Berea College

Union College

Rockford College

provided, however, that if the amount remaining to be allocated to this group number 3 shall exceed $300,000, each of this group shall receive $50,000 and the residual amount shall be allocated among the institutions listed in groups numbers 1 and 2 on a proportionate basis. (Each institution listed in groups numbers 1 and 2 shall receive that part of the amount in excess of $300,000 as bears the same proportion to such excess amount as does the dollar amount specified for that institution under the terms of group number 1 or 2 bears to the total dollar amount specified for all the institutions under groups numbers 1 and 2.)"

The bank incorporated this plan into its amended answer of June 22, 1971.

The Stuart sisters responded to this proposal in a letter dated June 22, 1971. In the letter, the sisters specifically denied that they had approved a gift to the Chicago Foundation for Cultural Development, and stated that they did not even have knowledge of the gift until it was disclosed in the bank's pleadings. The sisters acknowledged their agreement to the other three completed gifts listed in the bank's letter and then set forth their plan for final distribution:

"Accordingly, our definitive plan for the distribution of the remainder of the Harold L. Stuart Estate is to make immediate specific dollar commitments as follows:

| | |
|---|---:|
| Illinois Institute of Technology | $4,000,000 |
| Art Institute of Chicago | 5,000,000 |
| Kenilworth Historical Society | 30,000 |

The gift of $5,000,000 to the Art Institute, however, is to be reduced (but not below $2,500,000) to the extent necessary to give Illinois Institute of Technology at least 75% of the total amount of the estate passing to all charities, disregarding for this purpose what Illinois Institute may receive from the trusts created for us under our brother's will.

If any funds remain after making the foregoing distributions, they are to be given to Illinois Institute of Technology to provide additional endowment for the Harold Leonard Stuart School of Management and Finance.

We also hereby specify the distribution to be made of the remainder interests in the trusts created for us under our brother's will. If the funds remaining in the trust of the one first to die equal or exceed $500,000, a grant of that amount shall be made to the Chicago Historical Society; if the funds remaining in the other trust at the death of the survivor equal or exceed $500,000, a grant of that amount shall be made to the Newberry Library; and, subject to such conditional grants, the remainder interest in each of our trusts shall go to Illinois Institute of Technology to increase the endowment of the Stuart School."

On June 29, 1971, the Stuart sisters and IIT filed an amended complaint. A second amended complaint which contained four counts was later filed. Count I was brought

by the sisters and alleged that the bank had breached the trust provisions of the will by reason of its payment of $250,000 to the New Chicago Foundation. Count II was brought by both the sisters and IIT. Count II requested that the estate be distributed in accordance with the plan contained in the sisters' letter of June 22, 1971, and requested that all future disputes be resolved by the decision of the two family trustees. Count III was brought by IIT alone and sought a declaration that IIT had a vested interest in an additional grant of $3.5 million. Count IV was also brought by IIT alone and sought a declaration that IIT had a vested interest in the remainders of the personal trusts to be enjoyed after the termination of the sisters' life estates.

On September 15, 1971, the plaintiffs filed a motion for judgment on the pleadings on the basis of an interpretation of Article Seventh of the will. This motion was denied. Subsequently, 27 charities which were named in the various proposals were granted leave to intervene.

The circuit court entered judgment on November 15, 1974, after a trial without a jury. The trial court held for the bank as to the first three counts of the complaint. The court found the gift to the Chicago Foundation for Cultural Development to be proper although the court also found that the gift had not been approved by the Stuart sisters. The circuit court also approved and adopted the entire distribution plan proposed by the bank. In regard to count III, the court found that IIT had no right to an additional grant of $3.5 million. The circuit court did, however, find for IIT on count IV and directed that the remainder interests in the personal trusts of the sisters be distributed in accordance with the sisters' wishes upon termination of the life estates. The plaintiffs appealed the rulings as to the first three counts, and the appellate court affirmed the lower court's decision in all respects. Harriet Stuart died while this cause was pending before the

appellate court. The Northern Trust Company, as executor of her estate, appears before this court as cross-appellee to respond to the cross-appeal of De Paul University *et al.* challenging the sisters' right to fees and expenses as executors and trustees.

In rendering its judgment, the circuit court did not purport to be establishing its own scheme of distribution. Rather, the court made it clear that it was accepting the bank's plan in total with the exception of its ruling as to count IV. The appellate court also considered the issue facing the trial court to be which of two competing plans to adopt. (43 Ill. App. 3d 169, 197.) While this case was pending in the appellate court, the Stuart estate received approximately $4.5 million as a result of certain Federal estate tax litigation. The trial court had been informed that the parties expected an additional $3.5 million to be available as a result of this litigation. At present, the amount of distributable funds exceeds the $9.75 million aggregate of the specific dollar commitments in the bank's plan, which was approved by the circuit court, by more than $6.5 million. Under the lower court's rulings, this money will be distributed on a *pro rata* basis to the charities which comprise groups 1 and 2 of the bank's plan which we have previously quoted. Under the bank's plan, IIT and the group 3 charities are precluded from sharing in the additional $6.5 million. Additionally, under the circuit court's ruling it appears that the Chicago Historical Society will receive $1 million although the bank and the Stuart sisters designated that charity for no more than a $500,000 grant.

A number of issues, and subissues, have been raised by the various parties to this appeal. The Stuart sisters and IIT contend that the payment of $250,000 to the Chicago Foundation for Cultural Development constituted a breach of trust on the part of the bank and argue that severe sanctions should be applied to the bank. Plaintiffs, IIT and

the Stuart sisters, and an intervenor, the Art Institute of Chicago, also advance several contentions relating to the construction of Harold Stuart's will which, if accepted, would mandate reversal of the circuit court's judgment and adoption of the distribution plan proposed by the sisters. Alternatively, IIT and the Stuart sisters contend that the circuit court's adoption of the bank's scheme of distribution was erroneous. Plaintiff IIT contends, in the alternative, that it has a vested interest in an additional $3.5 million of the estate. Plaintiffs also challenge the amount of the grant which will be received by the Chicago Historical Society under the circuit court's decision.

Finally, a number of the charitable intervenors cross-appeal from the circuit court's order approving a grant of fees to attorneys for the plaintiffs. And, the Museum of Science and Industry, an intervenor, cross-appeals from the circuit court's ruling which limits the museum to a grant of $50,000.

The first issue to be considered is whether the bank breached its duty as a trustee by unilaterally distributing $250,000 to the Chicago Foundation for Cultural Development. This grant was made to the above organization with the prior understanding that the money would be passed on to the New Chicago Foundation. The circuit court found that the Stuart sisters had not assented to this gift and that they would not have agreed to it, but nonetheless found the gift to be "proper."

The New Chicago Foundation published Chicago Magazine. The Chicago Foundation for Cultural Development and the New Chicago Foundation were suborganizations of the Mayor's Committee for Economic and Cultural Development of Chicago. Kennedy, the then chairman of the board and chief executive officer of the Continental Bank, had been active in the creation of the Mayor's Committee in 1961. He was on the executive board of the Mayor's Committee and was a founding

director of the New Chicago Foundation. Another bank official served as president of the New Chicago Foundation and as an officer of the Foundation for Cultural Development. As mentioned, it is uncontroverted that the $250,000 grant was made to the Foundation for Cultural Development with the prior understanding that the money would be transferred to the New Chicago Foundation to be used for the publication of Chicago Magazine. The magazine was a project of the Mayor's Committee and was intended to create a favorable impression of Chicago by publishing articles about the city.

Harold Stuart's will provided that distributions were to be made to "qualified charitable organizations." In Article Fourth of the will that term was defined in part as "qualified exempt organizations for the purposes of Sections 170(c), 501(c)(3) and 2055 and other related provisions of the Internal Revenue Code in effect at the time of my death." The New Chicago Foundation was not qualified as an exempt organization under section 501(c)(3).

Kennedy testified that he had spoken to Harriet Stuart and proposed a gift to the New Chicago Foundation. He further testified that Harriet Stuart did not expressly concur in the proposal. Kennedy described Harriet Stuart's reaction to the proposal as follows: "And I had no reaction to that, good, bad or indifferent. I didn't have any yes, no, I don't know, on it. It was just a statement by me." Elizabeth Stuart testified that she was unaware of the distribution until three years after it was made, and the bank admitted that prior to October 7, 1970, no document was sent to the Stuart sisters which mentioned either the Mayor's Committee, the Foundation for Cultural Development or the New Chicago Foundation.

On January 16, 1968, Kennedy directed the bank's trust department to transfer $250,000 from the Stuart trust to the account the New Chicago Foundation kept

with the bank. He also requested that written authorizations be prepared for the Stuart sisters' signatures. The authorizations were prepared but were never sent to the family trustees. When it was learned that the New Chicago Foundation was not a qualified organization under section 501(c)(3), Kennedy directed that the disbursement be made through the Foundation for Cultural Development which was so qualified, and the $250,000 was transferred in this manner. The funds were used to support the now-defunct Chicago Magazine.

In September of 1969, it became necessary to establish a charitable trust. Prior to this time, the bank had hoped that distributions to charity could be made directly from the Stuart estate, but the pending Federal tax litigation made that plan impractical. In the second current account of the probate estate, the bank listed the $250,000 disbursement of January 26, 1968, as a partial disbursement from the estate to the Harold L. Stuart charitable trust. No mention was made of the New Chicago Foundation or of the Foundation for Cultural Development in either the probate account or in the account receipt presented to, and signed by, the individual trustees.

The Stuart sisters contend that the bank violated its duty as a trustee by disbursing $250,000 without obtaining the approval of the individual trustees, and by transferring that amount to an organization that was not qualified to take under the will. We agree that the bank's conduct in relation to the gift to the New Chicago Foundation constitutes a breach of trust.

The bank does not argue that it had authority under the Stuart will to make disbursements without the concurrence of at least one of the family trustees while both of the sisters were living. Though several interpretations of the will are advanced by the various parties, no party contends, nor could it reasonably be argued, that the bank had the unilateral authority to make disbursements

at the time the gift was given to the New Chicago Foundation. The bank, however, now asserts that the circuit court had the authority to retroactively approve the bank's actions. The bank seemingly argues that since the court could have approved of this gift if a *bona fide* deadlock existed under the will, then it does not matter that there was no deadlock at the time the funds were distributed. We find this line of reasoning to be without merit.

It is axiomatic that the limits of a trustee's powers are determined by the instrument which creates the trust (Restatement (Second) of Trusts sec. 164 (1959); *McGookey v. Winter* (1943), 381 Ill. 516, 524), and that a co-trustee cannot exercise a joint power individually (Restatement (Second) of Trusts secs. 194, 383 (1959); 90 C.J.S. *Trusts* sec. 258 (1955); *Maton Bros., Inc. v. Central Illinois Public Service Co.* (1934), 356 Ill. 584; *Dingman v. Boyle* (1918), 285 Ill. 144, 148).

In *Chicago Title & Trust Co. v. Chief Wash Co.* (1938), 368 Ill. 146, 155, this court defined the term "breach of trust":

> "The term 'breach of trust' is sufficiently comprehensive to include every violation by a trustee of a duty which equity lays upon him, whether willful and fraudulent, or done through negligence, or arising through mere oversight or forgetfulness. Included is every omission or commission which violates in any manner the three major obligations of carrying out a trust according to its terms, of care and diligence in protecting and investing the trust property, and of using perfect good faith."

Under this definition, the bank's exercise of unauthorized distributive power clearly constituted a breach of its duty to carry out the trust according to its terms.

The bank's conduct reveals that it was aware that it

had no authority to unilaterally make the gift in question. Written authorization was prepared for the sisters' signatures, but was never sent to them. Also, Kennedy's testimony revealed that he knew he did not have the express approval of the Stuart sisters, and no explanation is offered for the failure of the bank to obtain such assent before releasing the $250,000.

In addition, there is a second independent ground upon which to predicate a holding that the bank breached its duty as trustee. The will of Harold Stuart specifically required that grants be made only to charitable organizations which qualified for an exemption under section 501(c)(3) of the Internal Revenue Code. The New Chicago Foundation was not so qualified, and the bank was well aware of this as evidenced by the circuitous manner in which it transferred the funds to that foundation. The authorization which had been prepared for the sisters' signatures specified the New Chicago Foundation as the donee and not the conduit through which the money ultimately passed.

The circuit court had no authority to approve the grant under the circumstances of this case. We are aware of no authority which would authorize a court of equity to condone an unauthorized distribution to an unqualified beneficiary absent exceptional and unusual circumstances. As precedent for its position the bank relies almost exclusively upon *Warner v. Rogers* (1929), 255 Ill. App. 78. In *Warner,* the testator left an estate composed of large holdings of farmland. The will created a trust whereby the beneficiaries of the life estate, testator's grandchildren, were also the trustees. In their capacity as beneficiaries, the trustees entered into an agreement naming one of their number as managing trustee. Under the agreement, the approval of the other trustees was necessary in order to make repairs and improvements except those of a small, temporary and urgent nature. The managing trustee made

numerous repairs which were not agreed to by one of the trustees. This trustee's consent could not be obtained because she was living abroad during the time in question. The court found that most of the repairs made were "small and urgent," and further found that the larger repairs were "urgent and necessary to the preservation of the [property]." (255 Ill. App. 78, 87.) The appellate court noted that the managing trustee should have sought leave of court to make the few large repairs and stated that the circuit court would have granted approval had he done so. The appellate court then held that "under the facts as they specifically appear in this particular case, we do not believe that in equity and good conscience appellee should be penalized for not having done so." 255 Ill. App. 78, 89.

We hardly consider *Warner* to be support for the position which the bank advances. As the above quote demonstrates, the decision was expressly limited to the particular facts involved. Moreover, there are no exceptional circumstances involved here which would justify the bank's failure to follow the clear terms of the will. There was no urgent need for making this gift, and no issue of preserving trust assets is involved. The bank knew it had no authority to act without the concurrence of one of the sisters, and it further knew that the intended beneficiary was not qualified to take under the express terms of the will. The breach of duty in the present case is clear, and we cannot condone it. We hold that the bank breached its duty as a trustee by giving $250,000 to the New Chicago Foundation through the chosen conduit organization, and that the circuit court erred in retroactively approving said gift.

The Stuart sisters maintain that the proper remedy for the bank's breach of trust is to require repayment of the gift, to disqualify the bank from acting further as a trustee, and to disqualify it from participating in the selection of charitable beneficiaries.

We agree that the bank must restore the amount which was improperly released from the estate. A trustee is personally liable for any loss occasioned by a violation of his duties as trustee. (Restatement (Second) of Trusts sec. 226 (1959); *Piff v. Berresheim* (1950), 405 Ill. 617; 3 A. Scott, Trusts sec. 205 (1967); 4 A. Scott, Trusts sec. 386 (1967).) This rule applies where the violation is a result of negligence or mere oversight as well as when the trustee is wrongfully motivated. (*Chicago Title & Trust Co. v. Chief Wash Co.* (1938), 368 Ill. 146; see generally 3 A. Scott, Trusts sec. 201 (1967).) Here, the unauthorized and unilateral payment to an unqualified beneficiary reduced the value of the estate by $250,000, and the bank, on remand, will be required to return this sum to the estate together with interest computed from the date of the gift.

We do not, however, determine that the bank should be removed as a trustee or disqualified from participating in the selection of charitable beneficiaries. The Stuart sisters contend that such an additional sanction is necessary as a deterrent and as punishment for the bank's breach of trust. The sisters characterize the bank's conduct as self-dealing and assert that the bank succumbed to a conflict of interest. In our view, the record does not conclusively establish a basis for such a contention. Nor are we unmindful of the fact that disqualification of the bank would in reality be a punishment of the intervening charities which are listed as beneficiaries in the bank's plan of distribution. We, therefore, determine that no additional sanctions are warranted under the facts of the instant case.

We turn next to the issues raised concerning the interpretation of the will of Harold Stuart. In several places in the first six articles of the will the testator directed gifts to charity. In each instance the testator merely directed that the gift be paid to "such qualified charitable organizations as may be selected by my Execu-

tors," or used a similar expression which carried the same meaning. The dispute involved in the instant appeal concerns the provisions of Article Seventh of the will. Article Seventh contains a number of what may be termed standard provisions relating to the powers of the trustees and the administration of the estate. Article Seventh, however, also includes the following provision.

> "A majority of the Trustees or of the Executors, as the case may be, may take any action hereunder with the same force and effect as though all the Trustees or Executors had joined therein, *provided that the corporate Trustee or corporate Executor shall be one of such majority.* If at any time there shall be only one individual Trustee or Executor surviving, then in the event of any disagreement between the two Trustees or Executors, the determination of the corporate Trustee or corporate Executor shall control." (Emphasis added.)

The circuit court and the appellate court both found that this provision required the concurrence of the bank in the selection of any charitable beneficiaries. The Stuart sisters, IIT and the Art Institute, an intervenor, all contend that the above-quoted provision does not preclude the application of majority rule to the selection of charitable beneficiaries by the three trustees.

Plaintiffs challenge the circuit and appellate courts' interpretation of Article Seventh on several grounds. The Art Institute contends that the provision was not intended to apply to distributive powers, but rather was limited in application to the administrative duties of the trustees. IIT and the Stuart sisters contend that the provision should be read as a directive to the bank to act as a tie-breaker whenever the individual co-trustees are in disagreement. It is also contended that if the provision is interpreted as allowing a deadlock, majority rule should still apply because the will fails to provide a mechanism for breaking that deadlock.

At common law a majority of the trustees of a

charitable trust were competent to exercise the powers conferred upon them, unless the terms of the trust provided otherwise. (Restatement (Second) of Trusts sec. 383 (1959).) This rule was extended by statute to private trusts as well. The applicable statute provided that in cases of multiple trustees, "a majority of the trustees shall be competent to act in all cases, *** *unless the instrument of authority creating the trust shall otherwise provide."* (Emphasis added.) (Ill. Rev. Stat. 1963, ch. 148, par. 33.) The basic issue to be determined in regard to all the will interpretation arguments raised by plaintiffs is whether the provisions of Article Seventh preclude the application of "majority rule."

The duty of a court in construing a will is to determine the intention of the testator. (*Feder v. Luster* (1973), 54 Ill. 2d 6.) The intent is to be ascertained by viewing the will as a whole and by giving to the words used their plain and ordinary meanings. (*Helms v. Darmstatter* (1966), 34 Ill. 2d 295; *In re Estate of Breault* (1963), 29 Ill. 2d 165.) If the testator's intention can be gathered from the language of the will, no resort will be made to technical rules of presumed intention. (*Storkan v. Ziska* (1950), 406 Ill. 259.) We do not consider the language of Article Seventh to be vague, doubtful or uncertain. The previously quoted provision expressly states that the majority of trustees may take "any action hereunder *** provided that the corporate Trustee *** shall be one of such majority." The only reasonable interpretation to which this language is susceptible is that a majority of the trustees could take effective trustee action only if the bank was one of that majority.

It is contended, however, that such an interpretation places Article Seventh in conflict with the earlier provisions devising the estate to charitable organizations "as may be selected by my trustees." This contention is untenable. Article Seventh is the only portion of the

Stuart will in which effective trustee action is defined. The earlier dispositive articles provide only that the trustees shall select the charitable beneficiaries, and do not dictate the manner in which an effective selection is to be made. Thus the dispositive portions of the will cannot be considered to be in conflict with Article Seventh for the elementary reason that they do not pertain to the same subject matter.

Because the language of Article Seventh, when read either in isolation or in relation to the entire will, unambiguously and clearly requires that the corporate trustee be one of any majority of trustees, we cannot accept the argument that the provision only requires that the bank act as a tie breaker. Nor can we accept the contention raised by the Art Institute that the majority provision of Article Seventh applies solely to administrative rather than dispositive matters. The use of the expansive phrase "any action hereunder" is a clear indication that the testator intended the majority clause to apply to the entire will. The word "hereunder" is used several times in Article Seventh and each time is used in reference to the entire will and cannot reasonably be said to be limited to Article Seventh. We hold, therefore, that the circuit and appellate courts correctly interpreted the will of Harold Stuart in this regard.

The Stuart sisters further contend that because the will provides no means to break a deadlock, the statutory policy of majority rule should apply. We do not agree. The statute involved provides only that majority rule shall apply "unless the instrument or authority creating the trust shall otherwise provide." (Ill. Rev. Stat. 1963, ch. 148, par. 33.) The statute thus does no more than to provide for majority rule when the instrument creating the trust is silent on that matter. Here, the will was not silent on the subject, and the fact that the will allows for the possibility of a deadlock is not a sufficient reason to

disregard the expressed intention of the testator.

We next consider plaintiffs' contention that the circuit court erred in the manner in which it resolved the deadlock. As previously mentioned, the trial court essentially adopted the plan of distribution proposed by the bank and did not purport to create its own scheme of distribution. The trial court did, however, adopt the plan of the plaintiffs as to the distribution of the remainder of the trusts in which the Stuart sisters held life estates. The plaintiffs contend that the circuit court erred in failing to develop its own, independent plan of disposition once the court determined that a deadlock existed. Similarly, the plaintiffs contend that the bank's plan, which the circuit court adopted, was unreasonable and unsupported by the evidence. We do not consider that the trial court erred in failing to frame a wholly new scheme of distribution, nor do we consider that the entire plan of the bank was unsupported by the evidence.

Where trustees who are required to make discretionary decisions reach an irreconcilable difference of opinion, the deadlock must be resolved by the courts. (*Dingman v. Boyle* (1918), 285 Ill. 144.) Both sides of this controversy refer us to the Second Restatement for guidance and for a description of the procedure which a court of equity will follow when framing a scheme of charitable distribution. Restatement (Second) of Trusts secs. 396, 397, 399 (1959).

Section 397 of the Restatement provides, in part, that "a disposition for charitable purposes will not fail because of the failure of the trustee to act or for want of a trustee." Comment *c* to section 397 refers to a situation similar to that involved in the present appeal.

> "Where the settlor leaves property for such charitable purposes as the trustee may select, and the trustee named is unable or unwilling to make the selection, and the settlor did not manifest an intention that the intended charitable trust should not arise or should not continue if

the person named by him should not act as trustee, the court will either appoint a new trustee to make the selection or will frame a scheme for the application of the property. *** [T]he court will frame a scheme for the application of the property, as it does in situations where a particular charitable purpose fails and the doctrine of cy pres is applicable. See sec. 399, comment d."

Thus, though the *cy pres* principle does not, strictly speaking, apply to a situation where co-trustees with the discretion to select charitable beneficiaries are unable to act, the court will be guided by the procedures which have been established under that doctrine.

Comment *d* to section 399 mentions certain factors the court will consider in framing a scheme of charitable distribution.

"Under the circumstances stated in this Section, the court will direct the framing of a scheme to apply the trust property for some charitable purpose falling within the general charitable intention of the settlor. In framing a scheme the court will consider evidence as to what would probably have been the wish of the settlor at the time when he created the trust if he had realized that the particular purpose could not be carried out. The court will consider not only the language of the trust instrument, but also such circumstances as indicate what would have been the probable desires of the settlor, such as the character of the charitable gifts previously made by him, the charities in which he had expressed an interest, his religious affiliations, his views on social, economic and political questions, and the like."

The testimony of relatives of the donor may also be considered in order to indicate the types of charities in which the donor had been interested. G. Bogert, *Trusts and Trustees* sec. 442 (2d ed. 1964).

We feel that the above provisions of the Second Restatement of Trusts generally indicate the proper procedures and considerations to be applied to a situation like the present. When confronted with the deadlock between the Stuart sisters and the bank, it was incumbent

upon the trial court to resolve the dispute by either appointing a new trustee or by framing a plan of distribution. We do not agree, however, with the plaintiffs' contention that the trial court committed reversible error merely because after hearing extensive evidence it chose to substantially adopt the plan advanced by the corporate trustee. We cannot ignore the unique nature of the situation with which the trial court was confronted. It must certainly be considered unusual for a testator to leave an estate in excess of $20 million to be distributed by his trustees to charity with no further guidance or direction. As the above-mentioned sections of the Second Restatement· indicate, the primary duty of the court was to effectuate the probable charitable intent of the testator. The crucial issue is whether the evidence supports the conclusion that the court fulfilled this duty by ordering distribution pursuant to the plan which it did endorse. In determining this issue, the fundamental rule applies that the findings of a trier of fact will not be overturned unless contrary to the manifest weight of the evidence. *E.g.*, *Brown v. Commercial National Bank* (1969), 42 Ill. 2d 365.

Evidence was presented on behalf of the various charitable organizations suggested as recipients by the bank, specifying the nature of the charity, the persons served, its financial needs, etc. In our view, there was ample evidence to support the trial court's selection of the charitable beneficiaries sponsored by the bank and to reject the scheme of distribution advanced by the sisters. The language of the Stuart will offers no indication as to the probable charitable intent of the testator. Indeed, the only conclusion that can be drawn from the language of the will is that the testator had no specific plan as to which charities would share in his estate. Though the testimony of Elizabeth Stuart was to the effect that Harold Stuart did in fact have a particular plan in mind, and that he had

a "list" of charities he favored, the trial court was not bound to accept her testimony at face value. Her testimony was not entirely consistent, and its credibility was weakened by the fact that the testator failed to disclose the alleged "list" of charities to his corporate trustee and in fact had indicated to the bank that the choice of the beneficiaries was to be entirely discretionary with the trustees.

Additionally, evidence was presented which indicated that the bank had framed its plan of distribution in a manner designed to determine the probable charitable interests of Harold Stuart. The testator's business records and tax returns were studied for evidence of prior charitable donations. The testator's diary was read to learn of past contacts with charities and their representatives. And Harold Stuart's closest business contacts were interviewed to ascertain those charitable organizations in which he had shown an interest. In sum, competent evidence was introduced to indicate that the probable intent of Harold Stuart would have been to favor a broad-based distribution to the type of charities listed in the bank's plan.

There was thus competent and credible evidence to support the circuit court's decision, as the trier of fact, to endorse and accept the beneficiaries proposed by the bank. We hold, therefore, that the circuit court's decision to accept the beneficiaries proposed by the corporate trustee in preference to the smaller number of beneficiaries endorsed by the individual trustees was not against the manifest weight of the evidence. We also find, however, that certain aspects of the overall plan adopted by the court, which relate to the amount of the particular distributions, are either not supported by the evidence or are erroneous as a matter of law.

We determine that the circuit court erred in its denial of the relief requested by plaintiff IIT in count III of the second amended complaint. In that count, IIT asserted a

vested right to an additional $3.5 million of the estate. The facts relevant to this issue may be briefly restated. A formal "Statement of Intent" dated October 10, 1968, was signed by the Stuart sisters designating IIT to receive $8.5 million. Subsequently, $5 million was distributed to IIT, but the Stuart sisters never ceased their efforts to have that institution receive a greater amount. In a letter dated October 7, 1970, the bank designated IIT to receive an additional $3.5 million as part of a total plan of distribution. This letter read in pertinent part:

> "1. Increase the trust's present commitment to the Illinois Institute of Technology by an additional $3,500,000 (To be used for endowment and Chicago-Kent College of Law. This raises the total commitment to IIT to $8,500,000, the amount you originally suggested.)"

This letter was by coincidence drafted on the same date that IIT and the Stuart sisters filed their original complaint. In its answer to the complaint filed November 9, 1970, the bank reiterated this proposal, stating that "at the present time there is a disagreement among the trustees insofar as defendant proposes a total gift of $8.5 million to IIT while the individual trustees demand a grant to IIT equal to three-quarters of the available trust assets." The bank also prayed that the court direct distribution in accordance with its plan which included a total grant to IIT of $8.5 million. On June 15, 1971, the bank withdrew this proposal in a letter to the Stuart sisters. At the time of the sisters' final proposal of three-quarters of the estate to IIT, the bank had advised the sisters that approximately $9 million would be available for distribution.

Article Fifth of Harold Stuart's will provided that if the trust could not be distributed within 5 years the executors were to select the charitable beneficiaries in writing prior to the expiration of that period of time. Article Fifth further provided that the interests of the selected charities would vest at the end of the 5-year

period. IIT contends that the sisters' "Statement of Intent" of October 10, 1968, and the bank's letter of October 7, 1970, constitute a written designation of IIT as the beneficiary of an $8.5 million grant. The appellate court rejected this argument, reasoning that there had been no simultaneous selection of IIT to receive $8.5 million, and that there was no "meeting of the minds" because the sisters had designated IIT for three-quarters of the estate. 43 Ill. App. 3d 169, 198-99.

We initially note that resolution of this issue does not call for a resort to the niceties of contract law rules concerning offer and acceptance. It is apparent from the record before us that all three trustees had designated IIT as the recipient of at least $8.5 million by the time this unfortunate controversy reached the courts. As its own pleadings indicate, at the time the suit was filed the bank proposed an $8.5 million grant to IIT. The only disagreement stemmed from the fact that at that time the Stuart sisters had designated IIT to receive three-quarters of the available estate. The bank's decision to withdraw its proposal for an additional grant to IIT did not occur until some time after this litigation had commenced.

Our review of the record leads us to the inescapable conclusion that the bank withdrew its earlier proposal because of the then pending litigation and because the Stuart sisters would not endorse its total plan of distribution. The testimony of the bank officer charged with the overall supervision of the trust reveals no reason for the bank's withdrawal of the additional grant to IIT except that it was precipitated by the sisters' refusal to assent to the bank's total demands. Additionally, the bank officer could not recall the reason that certain of the other grants had been raised after the additional $3.5 million to IIT was withdrawn. These increased grants, together with several new gifts, were roughly comprised of the amount previously earmarked for IIT. In short, no evidence was

offered to support the reduction in IIT's designation.

From the record before us, we can only determine that the bank's withdrawal of its proposal for an additional grant to IIT was arbitrary and unreasonable. The trustees had, in effect, all proposed that $8.5 million was the minimum amount IIT should receive. The trial court should have accepted this figure as an amount over which the trustees had reached agreement, as was specifically stated in the bank's pleadings. Because there was no evidence to suggest that the amount of this grant subsequently became unreasonable or inappropriate, the circuit court erred in failing to find for IIT as to count III. We hold, therefore, that upon remand an order be entered directing that an additional $3.5 million of the estate be distributed to IIT.

We next consider whether the evidence supports a total grant of $1 million to the Chicago Historical Society. The Chicago Historical Society was listed as a beneficiary in the plan of distribution submitted by the bank. The amount of the gift was $500,000. The society was also listed by the Stuart sisters as a beneficiary of $500,000 of the remainder interest in the trust estates created for them. As mentioned, the bank submitted no plan to dispose of the remainder interests in the sisters' life estates. Neither the bank nor the sisters proposed to the court that the Chicago Historical Society should receive a gift of $1 million. Yet, the effect of approving the designations by the sisters as to the charities to take from the remainders of their life estate trusts, while adopting the bank's plan for the distribution of the rest of the estate, was that the circuit court awarded the Chicago Historical Society a total of $1 million.

It is contended that this is an inadvertent duplication. We find that it is not. Prior to the entry of the judgment order in the circuit court, IIT, the Stuart sisters, and the Museum of the Science and Industry objected to the

proposed decree and requested certain modifications. The Stuart sisters specifically pointed out that the effect of the court's proposed ruling would be to give to the Chicago Historical Society $500,000 from the remainder of the sisters' trust and $500,000 from the other trust funds available for distribution by the trustees, making a total gift to that charity of $1 million. The sisters urged in their objection that it was not their intent that the Chicago Historical Society should receive a total gift from all funds of more than $500,000. The court nonetheless, in entering its final order of distribution, provided that the Chicago Historical Society should receive $500,000 through the distribution plans submitted by the bank (which did not purport to distribute the remainder of the sisters' trusts), and it also approved the plan submitted by the sisters in count IV for the distribution of the remainder of the sisters' trusts, which plan provided for an additional $500,000 to this charity. This clearly is not an oversight on the part of the court or a case of inadvertence. There were two separate funds involved in the litigation. The bank never proposed to participate in the distribution of the remainder of the sisters' trusts and denied that the court should order any distribution of this remainder as prayed by IIT in count IV. The plan the bank submitted in its answer to count II involved a distribution from the other funds which the will directed be set over to charity after the two $1 million trust funds had been established for the sisters. We do not find the two separate distributions from the two separate funds as ordered by the court to be contrary to the manifest weight of the evidence.

The Museum of Science and Industry, an intervenor, contends that the trial court's judgment is against the manifest weight of the evidence in that the museum is limited to a gift of $50,000, and, as a group 3 charity under the bank's plan, is prevented from sharing in the residual amount of the estate. The museum contends that,

due to its size and the extent of its operations, it should be classified as a group 1 charity under the bank's approved plan rather than as a group 3 charity. Evidence was introduced to demonstrate that the museum is a far more sizeable institution than the other charities which comprise group 3.

Although the evidence shows that the Museum of Science and Industry is similar in many respects to some institutions listed as group 1 charities, we cannot find that the listing of this institution as a group 3 charity is against the manifest weight of the evidence. The record reflects that the testator had visited the museum a limited number of times and had only a limited contact with and a general interest in this institution.

We next consider plaintiffs' contentions in regard to the allocation of the $6.5 million of funds in excess of the specific dollar amount of the court-approved plan. Plaintiffs contend that we should, at the least, direct that the circuit court conduct new proceedings and frame a scheme of distribution for the additional funds. Under the particular facts of the case, we find no reason to do so.

Under the court-approved plan, charities listed under groups 1 and 2 are to share in the excess funds on a *pro rata* basis. We find this aspect of the plan to be supported by the evidence. With the exception of the Museum of Science and Industry, only smaller charities with minimal contact with testator's sphere of interest were included in group 3. IIT is the only other charity which is precluded from taking a *pro rata* share of the excess funds, and the court could well have concluded that IIT's share of the estate was already of sufficient size. We cannot say that the circuit court's adoption of this aspect of the bank's plan is inequitable or contrary to the manifest weight of the evidence.

We finally consider whether the court awarded excessive or unwarranted attorneys' fees and trustee fees to the

Stuart sisters. This issue is raised by a number of the charitable intervenors. The circuit court granted specific fees to the sisters and their attorneys following a special hearing on the matter, and the appellate court affirmed.

The facts relevant to this issue are fully stated in the opinion of the appellate court. (43 Ill. App. 3d 169, 202-03.) We shall restate only those facts deemed necessary to an understanding of our disposition of this issue. Intervenors basically contend that the Stuart sisters had no authority to employ counsel or to charge the trust estate for such fees. It is also alleged that the attorneys' services were performed for the benefit of IIT rather than the sisters, and, thus, are not chargeable to the estate. We do not agree and therefore affirm the judgments of the circuit and appellate courts.

The determination of the need for attorneys' fees and the amount of such fees is a decision which rests in the discretion of the trial court. (*Ingraham v. Ingraham* (1897), 169 Ill. 432, 471-72.) The trial court did not abuse its discretion by finding that the Stuart sisters justifiably retained counsel and commenced the present litigation. The trustees were hopelessly deadlocked over the manner in which they should discharge their duties as trustees, and resort to the courts was necessary to resolve the impasse. Where, as here, the litigation is the result of honest differences of opinion, attorneys' fees and litigation expenses will be chargeable to the estate. (*Orme v. Northern Trust Co.* (1962), 25 Ill. 2d 151, 165.) We hold that the trial court did not abuse its discretion by charging attorneys' fees and expenses incurred by the Stuart sisters to the estate or by approving the payment of trustee fees to the individual co-trustees.

Nor do we accept the intervenor's contention that the estate was charged for services performed on behalf of IIT. This contention stems from the fact that the same attorney represented both IIT and the Stuart sisters for a

period of approximately 2 years. The attorney withdrew as counsel for IIT before the actual trial of the case. As the appellate court noted, the trial judge was aware of this period of dual representation and suggested that the fees be distributed between the sisters and IIT. Thereafter, a substantial reduction in the requested fees was made. We, therefore, hold that the trial court did not abuse its discretion in regard to the allocation of the fees and expenses incident to this litigation.

The judgments of the circuit court of Cook County and of the appellate court are affirmed in part and reversed in part, and the cause is remanded for modifications and further proceedings consistent with this opinion.

*Affirmed in part and reversed*
*in part and remanded,*
*with directions.*